780 P.2d 93

**STATE of Idaho, Plaintiff–Appellant,**

v.

**Bret R. WILSON,
Defendant–Respondent.**

**No. 17465.**

Supreme Court of Idaho.

June 30, 1989.

Rehearing Denied Oct. 19, 1989.*

---

* Dissenting opinion on denial of rehearing will be published.

Jim Jones, Atty. Gen., Myrna A.I. Stahman, Deputy Atty. Gen., Boise, for plaintiff-appellant. Myrna A.I. Stahman argued.

Paul T. Clark, Lewiston, for defendant-respondent.

JOHNSON, Justice.

This is a driving under the influence (DUI) case. The primary issue presented is whether the trial court properly prohibited and suppressed evidence concerning breath tests using an Intoximeter 3000 with a deactivated Taguchi cell. We hold that the Intoximeter 3000 with a deactivated Taguchi cell was approved by the department of health and welfare (the Department) for use as a direct breath testing instrument. No further certification of the instrument was required. We also hold that the Lewiston police department was approved by the Department as a forensic alcohol examination laboratory. We reverse the order of the trial court and remand the case for further proceedings.

## I.

### THE BACKGROUND AND PRIOR PROCEEDINGS.

Wilson was arrested for DUI on March 12, 1987. He submitted to a breath test at the Lewiston police department to determine the presence of alcohol in his blood. This test was conducted with an Intoximeter 3000 (the Intoximeter). The primary component of the Intoximeter is an infrared detector that measures the amount of ethyl alcohol in the breath of the person being tested. Another component of the Intoximeter is a Taguchi cell that measures the presence of acetone in the person's breath. In April 1985 the Taguchi cell on each Intoximeter in service in forensic alcohol laboratories in Idaho was deactivated at the direction of the forensic section of the Department's bureau of laboratories.

The presence of acetone in a person's breath can increase the infrared reading for alcohol measured by the Intoximeter. When the Taguchi cell is in operation as part of the Intoximeter, the instrument automatically subtracts the contribution of acetone to the infrared reading for alcohol. Acetone is not present in the breath of most people. In those cases where it is present, studies show that it increases the infrared reading for alcohol by 0.01 to 0.015. In Idaho it is unlawful for a person who has an alcohol concentration of 0.10 to drive or be in actual physical control of a motor vehicle. I.C. § 18–8004(1) (1987). The results of the test of Wilson's breath using the Intoximeter showed that he had an alcohol concentration of 0.17.

Wilson filed a motion to suppress and a motion in limine requesting that the trial court prohibit the State and its witnesses from introducing, referring to, or producing any testimony or evidence with respect to the breath tests conducted on him using the Intoximeter with the Taguchi cell deactivated. During the hearing on this motion on October 27, 1987, the State stipulated in

its argument that the Lewiston police department was not a forensic alcohol laboratory approved by the Department to conduct direct breath tests. At the conclusion of the hearing, the trial court ruled orally that the Intoximeter was not certified, but only approved, by the Department at the time Wilson was tested and granted the motion to suppress. On November 2, 1987, the State filed a motion for reconsideration. The affidavit of the deputy prosecuting attorney in support of this motion included a statement that after the trial court's ruling on October 27, 1987, the State learned from the supervising criminalist for the bureau of laboratories of the Department that the Lewiston police department was certified as a forensic alcohol laboratory for breath tests using the Intoximeter.

On February 24, 1988, the trial court issued findings of fact, conclusions of law, and order to suppress order in limine. The trial court found that in 1981 the bureau of laboratories of the Department authorized use of the Intoximeter in a configuration that included the infrared detector and the Taguchi cell. The trial court also found that if acetone were detected, the Intoximeter had to be "purged" with samples that had not been contaminated with acetone. Additionally, the trial court found that the Department had issued no written certification of the Intoximeter after the deactivation of the Taguchi cell in 1985. Also among its findings was the following:

> Plaintiff's counsel having stipulated in argument, the Court finds that Lewiston Police Department and its premises was not at the time of Defendant's arrest an approved or certified direct breath alcohol testing laboratory.

The trial court suppressed the evidence obtained through the use of the Intoximeter, because the testing was in violation of I.C. § 18–8004 and the rules and regulations of the Department. The trial court also issued an order in limine, because the Intoximeter with the Taguchi cell deactivated "bears no primary indicia of scientific reliability."

The State moved for reconsideration of the trial court's orders. The trial court denied the motion. The State appealed the orders to suppress and in limine and the denial of the motion for reconsideration.

## II.

### THE INTOXIMETER, WITH THE TAGUCHI CELL DEACTIVATED, WAS APPROVED BY THE DEPARTMENT.

■ The State asserts that the Intoximeter, with the Taguchi cell deactivated, was approved by the Department at the time Wilson was tested and was not required to be "certified." We agree.

At the time Wilson was tested, the legislature had authorized the Department to approve laboratories for the analysis of breath for the purpose of determining a person's blood alcohol concentration. This approval was required to be "under the provisions of approval and certification standards to be set by the department." I.C. § 18–8004(4). The rules and regulations of the Department provided that in forensic alcohol laboratories approved by the Department, only those direct breath testing instruments approved by the bureau of laboratories of the Department could be used. 16 IDAPA 02.7150.04(A) (1980).

The "certification" of the Intoximeter by the bureau of laboratories of the Department in 1981 stated that the Intoximeter was approved "in the configuration specified by the supervisor of Blood and Alcohol testing of the Forensic Section." In 1985, the supervising criminalist of forensic section of the bureau of laboratories of the Department directed that the Taguchi cell on each Intoximeter in service in Idaho be deactivated. This constituted the necessary approval of the Department for use of the Intoximeter with the Taguchi cell deactivated. No additional certification was required by I.C. § 18–8004(4) or by the rules and regulations of the Department.

The legislature has prescribed that the Department may approve laboratories for analyzing breath to determine the blood alcohol concentration. According to the rules and regulations of the Department, these laboratories may use only those di-

rect breath testing instruments approved by the Department. The Department has approved the Intoximeter with the Taguchi cell deactivated. Any deficiencies in the accuracy of the measurement of ethyl alcohol that are occasioned by the lack of a Taguchi cell may be attacked by cross-examination or by independent evidence.

### III.

### THE LEWISTON POLICE DEPARTMENT WAS A LABORATORY APPROVED FOR FORENSIC ALCOHOL TESTING.

█ Wilson asserts that the finding of the trial court that the Lewiston police department was not an approved or certified direct breath alcohol testing laboratory is an alternate basis for affirming the trial court's decision. We disagree.

In making its finding in February 1988 that the Lewiston police department was not an approved or certified direct breath alcohol testing laboratory, the trial court relied on the stipulation of the State in its argument at the hearing on Wilson's motions for suppression and in limine on October 27, 1987. However, by its motion for reconsideration of November 2, 1987, and the supporting affidavit, the State advised the trial court that it had been mistaken and that the Lewiston police department was an approved laboratory. The record also contains a representation by Wilson's attorney that later in the day on October 27, 1987, after the hearing on Wilson's motions was held, the parties met in chambers and the State's attorney "informed the Court that it had come across a written list indicating the Lewiston Police Department to be an approved or certified direct breath alcohol testing laboratory." Objection to Proposed Order Submitted by Plaintiff, R. 116, 117. Since the trial court did not make its findings of fact and conclusions of law for three months thereafter, the trial court should not have continued to rely on the stipulation. At that point, the only evidence before the trial court was that the Lewiston police department was a laboratory approved by the Department for forensic alcohol testing.

To the extent that the trial court relied on the lack of approval of the Lewiston police department as an approved laboratory in making its decision, it was incorrect.

### IV.

### CONCLUSION.

The orders of the trial court to suppress the breath tests and to prohibit any evidence concerning them is reversed. The case is remanded to the trial court for further proceedings, if they are appropriate.

BAKES, C.J., and HUNTLEY, J., concur.

SHEPARD, J., sat, but did not participate due to his untimely death.

BISTLINE, Justice, dissenting.

The sole issue on appeal as stated by the State is this:

Did the continued use of the Intoximeter 3000 after the deactivation of the Taguchi cell and the continued monthly calibration check and certification of the Intoximeter 3000, but not a subsequent written certification from the Department of Health and Welfare similar to that issued February 27, 1981, comply with Idaho Code § 18–8004(4) and Rule 2–7150.04 of the Health and Welfare Rules Governing the Performance of Forensic Alcohol Examinations?

The State also filed with its brief a compilation of appendices which included the district court's written decision:

### "FINDINGS OF FACT

#### "I.

"Defendant at the time of his arrest on March 12, 1987, submitted to an evidentiary test of alcohol concentration at the request of the arresting officer. The arresting officer conducted or performed said evidentiary test using the Intoximeter 3000, a direct breath testing device. Such

testing was conducted at the Lewiston Police Department.

## "II.

"By memorandum dated November 4, 1981, Dr. Darrell W. Brock with the State of Idaho Department of Health & Welfare Bureau of Laboratories issued written certification and approval of the Intoximeter 3000, which certification and approval authorized use of the Intoximeter 3000 in a specified configuration as a direct breath testing device in accordance with Title 2, Chapter 7, Rule 2–7150.04 of the Rules and Regulations of the Department of Health & Welfare.

## "III.

"The Intoximeter 3000 in its original configuration had two measuring components. The principle measuring component was the infrared detector which was primarily designed to quantify the amount of ethyl alcohol in the breath on the basis of grams of alcohol per 210 liters of breath. The second measuring component was the Taguchi Cell, which measures and detects the presence of acetone. If acetone was present, the Intoximeter 3000 then subtracted the contribution of acetone from the infrared reading to give a revised reading.

"In addition, if the Taguchi Cell detected acetone the machine would give an indication that acetone had been detected, which would require a number of steps to be taken, including 'purging' the machine with several samples that had not been contaminated with acetone.

## "IV.

"In the summer of 1984 the State of Idaho Department of Health & Welfare made a decision to disconnect and deactivate the Taguchi Cell. Such deactivation of the Taguchi Cell on all Intoximeter 3000 machines used by Plaintiff in the State of Idaho was effected on or about April, 1985.

## "V.

"The State of Idaho Department of Health & Welfare has issued no other or further written certification of the Intoximeter 3000 at the Lewiston Police Department since November 4, 1981.[1]

## "VI.

"The technical configuration of the Intoximeter 3000 has been changed since April 1985, by the deactivation of the Taguchi Cell by Plaintiff State of Idaho.

## "VII.

"The State contends that monthly tests to determine that the machine is measuring ethyl alcohol within certain tolerances constitutes certification and approval. The Court finds that such monthly tests and the reports produced as a result thereof are not intended by the Department of Health & Welfare to constitute certification and approval pursuant to the statute and the rules of the Department of Health & Welfare. Those monthly tests are intended as a calibration to determine how closely the machine is reading known quantities of ethyl alcohol, and are not intended as a certification or approval.

## "VIII.

"When the Intoximeter 3000 at the Lewiston Police Department was originally certified for use on February 27, 1981, a certification was issued certifying and approving its use. That on November 4, 1981, a memorandum was issued to the Department of Health & Welfare which provided that the configuration specified by the supervisor of Blood and Alcohol Testing of the Forensic Section of the Department of Health & Welfare shall be the approved Direct Breath Testing Device. No such

1. The State's brief filed in this Court states at page 16: "No certificate other than the monthly calibration certificate was issued on the machine after the deactivation of the Taguchi cell. Mr. Groff, manager of the Forensic Section of the Idaho Department of Health and Welfare's Bureau of Laboratories, testified that the management at the bureau *felt* that certification of the Intoximeter 3000 after deactivation of the Taguchi cell was not required."

certification and approval has been issued after the Department of Health & Welfare changed the configuration of the Intoximeter 3000 by detaching the Taguchi Cell.

## "IX.

"That with the Taguchi Cell detached, the Intoximeter 3000 no longer corrects the reading of the infrared detector when acetone is present. This can clearly lead to results being inaccurate when a person is tested who has acetone in his system. In addition, the Intoximeter 3000 is no longer 'purged' after a subject who has acetone is tested since there is no way to determine whether or not the infrared detector has measured acetone.

## "X.

"Since the technical configuration of the Intoximeter 3000 has been altered, and since no written certification has been issued with respect to the Intoximeter 3000 as so modified, the Intoximeter 3000 is not now, nor was it at the time of Defendant's arrest, a direct breath testing instrument certified by the Department of Health & Welfare, Bureau of Laboratories. Since the Intoximeter 3000 is and was not at the time of Defendant's arrest such a certified direct breath testing instrument, the breath tests conducted on Defendant were taken and conducted in violation of Title 2. Chapter 7, Rule 2–7150.04 of the Rules and Regulations of the Idaho Department of Health & Welfare.

## "XI.

"Plaintiff's counsel having stipulated in argument, the Court finds that Lewiston Police Department and its premises was not at the time of Defendant's arrest an approved or certified direct breath alcohol testing laboratory.

## "XII.

"Each and every allegation contained in Defendant's Second Motion to Suppress and Motion in Limine, and in the Affidavit of Douglas L. Mushlitz submitted in support thereof, filed in this action is supported by proper and sufficient evidence and is true.

## "CONCLUSIONS OF LAW

## "I.

"Idaho Code § 18–8004 requires evidentiary tests for alcohol concentration to be performed by a laboratory operated or approved by the Idaho Department of Health & Welfare, and further requires analysis of breath for the purpose of determining alcohol concentration to be performed in accordance under provisions of approval and certification standards to be set by the defendant.

## "II.

"Title 2, Chapter 7, Rule 1–7150.04 of the Rules and Regulations of the Department of Health & Welfare mandates that only direct breath testing instruments approved by the Department of Health & Welfare, Bureau of Laboratories shall be used.

## "III.

"The Intoximeter 3000 having been physically and technically altered or modified by deactivation or removal of the Taguchi Cell, the instrument now constitutes a different technical and testing configuration than in November 1981. No certification of the Intoximeter 3000 having been issued since November 4, 1981, and the instrument having been altered and modified since April 1985, the Intoximeter 3000 in the present configuration as utilized by the Department of Health & Welfare was not at the time of Defendant's arrest and is not presently a certified and approved direct breath testing instrument.

## "IV.

"Suppression and limiting the introduction of evidence which was not obtained in accordance with the statute and the Rules of the Department of Health & Welfare are appropriate remedies as the testing was conducted in violation of specific statutory provisions and in violation of the Rules and

Regulations of the Idaho Department of Health & Welfare.

"V.

"Issuance of an Order in Limine is also an appropriate remedy. Without the necessary certification and approval, the Intoximeter 3000 in its present configuration bears no primary indicia of scientific reliability. Removal or deactivation of the Taguchi Cell seriously affects the accuracy and reliability of the test results procured by use of the Intoximeter 3000 in its present configuration.

"NOW, THEREFORE, BASED UPON THE FOREGOING FINDINGS AND CONCLUSION AND BASED UPON EVIDENCE RECEIVED UPON HEARING, THE COURT ENTERS THE FOLLOWING ORDERS:

"1. Plaintiff is prohibited from introducing, referring to, or producing any testimony or evidence with respect to the conduct or performance of any breath tests using the Intoximeter 3000 which was effected on or with regards the defendant at or near the time of his arrest and the results of said tests; FURTHER, such testimony and evidence is hereby SUPPRESSED.

"2. The Plaintiff filed a Motion for Reconsideration. The Motion for Reconsideration is hereby DENIED.

"DATED this 24th day of February, 1988.

/s/ E.B. Ponack
E.B. Ponack—District Judge"

The State asserts in its brief that:

The district court *correctly found that no certification similar to that initially issued when the Intoximeter 3000 was first selected as a direct breath testing device was issued after deactivation of the Taguchi cell.* But, the state submits that the court's conclusion that such certification was required by the applicable statutes and rules is a legal conclusion which is in error.

As just pointed out, neither Idaho Code § 18–8004(4) nor Rule 2–7150.04 requires certification of the breath testing device.

Certification of the laboratory and approval of the direct breath testing device is what was required. *The state* respectfully *submits that the state established that the Lewiston Police Department Laboratory was certified* by Health and Welfare (R., pp. 112–115) and that the Intoximeter 3000 with the Taguchi cell deactivated was approved by Health and Welfare. Therefore, the intoximeter 3000 used for testing Wilson's breath did conform with the statutes and rules governing direct breath testing devices.

Additionally, in its brief the State calls our attention to *State v. Flood,* 523 So.2d 1180 (D.C. of App.Fla.1988). The district judge in Wilson's case did not have the benefit of *Flood,* which had not at that time been decided. The certification versus approval issue here involved and decided by Judge Ponack was also involved in *Flood.* It appears that Judge Ponack and the Florida court are of the same view:

The state asserts that recertification was not required by the Florida Statutes because '[t]here is no stated requirement in any Florida Statute that breath testing machines must be "recertified," or even, for that matter, "certified." ' The state is technically correct in its assertion as to 'certification' and the appellees agree. However, section 316.1932(1)(a), Florida Statutes (1985), provides in part:

(1)(a) Any person who accepts the privilege extended by the laws of this state of operating a motor vehicle within this state shall, by so operating such vehicle, be deemed to have given his consent to submit to *an approved chemical test* of his breath for the purpose of determining the alcoholic content of his blood, and to a urine test for the purpose of detecting the presence of chemical substances as set forth in S.877.111 or controlled substances, if he is lawfully arrested for any offense allegedly committed while the person was driving or was in actual physical control of a motor vehicle while under the influence of alcoholic beverages, chemical substances, or controlled substances.

(Emphasis supplied.) The statute further provides:

An analysis of a person's breath, in order to be considered valid under the provisions of this section, must have been performed substantially *according to methods approved by the Department of Health and Rehabilitative Services.* For this purpose, the department is authorized to approve satisfactory techniques or methods. Any insubstantial differences between approved techniques and actual testing procedures in any individual case shall not render the test or test results invalid.

§ 316.1932(1)(b)1 (emphasis supplied). Consequently, the issue of *approval* of these machines is left to HRS per Florida statutory authority.

Florida Administrative Code Rule 10D–42.022 provides for HRS approval of chemical breath testing methods for determining blood alcohol content for evidentiary purposes. The I–3000 is listed as an approved chemical breath-testing instrument. *See* Fla.Admin.Code R.10D–42.024(9). According to the state, there is no rule requiring a machine to be recertified each time a modification is made. Appellees counter:

The state's argument that re-certification is not required by statute or rule is a shallow argument in that it is admitted by all parties that recertification or re-approval is not mentioned. What is mentioned is approval, and that's exactly what Defendants are arguing to this Honorable Court. The Defendants have examined the machine that was used in their cases and allege that it is not the machine that is on the approved list and is, therefor [sic], not an approved machine pursuant to Section 316.1931, Florida Statutes.

The appellees, as did the trial court, rely on *Commonwealth v. McGinnis*, 511 Pa. 520, 515 A.2d 847 (Pa.1986). In *McGinnis*, the defendant was arrested for operating a motor vehicle while driving under the influence of alcohol. A Breathalyzer test was administered, and the defendant attempted to have the results of the test suppressed, arguing that the test was conducted on a machine not approved by the Department of Health. The machine had been modified prior to use. The Supreme Court of Pennsylvania reversed the judgment of sentence and discharged the defendant, finding that while the unmodified machine was an approved testing device, it was uncontroverted that the modified machine was not approved by the Department of Health.

Under the rationale of *McGinnis*, the trial court, confronted with conflicting evidence, could properly determine as a factual matter that the chemical breath tests were inadmissible because the substantially modified I–3000 machine was not approved by HRS.

*State v. Flood,* 523 So.2d 1180, 1181–82 (Fla.App. 5 Dist.1988). Here, in Wilson's case the district court in a thorough, all-encompassing written findings of fact likewise concluded that the Intoximeter 3000 following modification was not thereafter recertified.

The Florida court in *Flood* also observed that "presumptions are rebuttable, and a defendant may in any proceeding attack the reliability of the testing procedures." 523 So.2d at 1182. The issue on appeal there, as here, narrowed down to ascertaining whether there "was, therefore, substantial competent evidence to support the county court's conclusion that the I–3000 recognized further testing."

## THE LEWISTON POLICE DEPARTMENT WAS *NOT A LABORATORY* APPROVED FOR FORENSIC ALCOHOL TESTING.

Part III of Justice Johnson's opinion concludes that the trial court in making its findings of fact and conclusions of law "should not have continued to rely on the stipulation ... that the Lewiston Police Department was not an approved or certified ... testing laboratory." His conclusion is arrived at by reason of a State's motion for reconsideration which "advised

the trial court that it (the State) had been mistaken and that the Lewiston Police Department was (had been at times pertinent) an approved laboratory."

The problem with such an approach and conclusion is two-fold. First, Idaho case law does recognize that stipulations may be entered into by mistake. But, because stipulations are solemnly entered into, case law also recognizes that they may not be simply disregarded, but the practice requires that a party wishing to be relieved of a stipulation must be ready to show not just that the stipulation was mistakenly entered into but, that it was an excusable mistake, and not the product of lack of reasonable diligence. Second, it must prove that in fact a mistake was made.

Here, there can be no doubting that the trial judge was not presented with a motion to set aside the stipulation, nor with any supporting affidavits showing that the mistake was inadvertent and occurred notwithstanding due diligence on the part of the State. *Loughrey v. Weitzel*, 94 Idaho 833, 498 P.2d 1306 (1972), "The denial by the district court *of her* (Emma Weitzel) *motion* to set aside the stipulation and reopen the case was a matter within the sound judicial discretion of that court." Emma Weitzel was a *pro se* litigant who as such had sitpulated to a dismissal of her appeal from probate court to district court. The state of Idaho, in contrast, is the largest governmental body in Idaho, and here was acting by a prosecuting attorney aided by the Department of Law Enforcement, Department of Health and Welfare, and a substantial corporation (CalDetect, the manufacturer and purveyor of intoximeters), and on appeal, at least, the well-staffed office of the Attorney General for the state of Idaho.[2]

In *Call v. Marler*, 89 Idaho 120, 403 P.2d 588 (1965), the parties orally at trial reached a stipulation, which the trial court repeated to them: "THE COURT: The record will show that you gentlemen have stipulated that W.W. Dillard and Essie Dillard have been residents of California dur-ing the terms—times in question in the cross complaint." *Call*, 89 Idaho at 127, 403 P.2d at 591. The report of that case provides no indication that any motion was made to be relieved of that stipulation. The stipulation was contrary to a pretrial conference order, but the stipulation prevailed and was held to modify the order. 89 Idaho at 127, 403 P.2d at 591. This Court took the time to note, however, that "a court may in its sound discretion relieve against a stipulation entered into mistake or misunderstanding of fact or entered into inadvertently, inadvisedly, or improvidently where under all the circumstances its enforcement would work an injustice." 89 Idaho at 127, 403 P.2d at 591. Again, as here, there was not such motion filed. As here, too, there was not in *Call v. Marler* any showing of excusable mistake.

In *State v. Enking*, 59 Idaho 321, 82 P.2d 649 (1938) this Court, *where relief from a stipulation had been moved for in the trial court*, which was denied, held insufficient the supporting grounds that the movants were not aware of the fact that the appointment of Idaho Fruit and Vegetable Advertising Commissioners was made before the act creating that commission became effective. Here "the State" in one of its component parts, Mr. Groff, head of Health and Welfare Bureau of Laboratories, was aware of the list of approved labs, which list was in his office.

In a more recent case, where the parties stipulated to a change of venue from Lemhi to Bonneville County, the trial court *on motion* relieved one party from the stipulation and transferred venue back to Lemhi County, consolidating the case with others and saving costs. This Court affirmed. *Thompson v. Turner*, 98 Idaho 110, 558 P.2d 1071 (1977).

In *Singleton v. Pichon*, 102 Idaho 588, 635 P.2d 254 (1981), Justice Shepard writing for a unanimous Court, noted very tersely, "The stipulation agreeing to submit the matter to this Court for its decision without trial and upon the then existing record is clear and without equivocation.

---

**2.** Somewhat out of the ordinary, it was a deputy attorney general who filed the notice of appeal, whereas it is generally the prosecuting attorney who does so.

The trial court's refusal to relieve counsel (and his client) of that stipulation was within the exercise of its discretion and we find no abuse of that discretion." 102 Idaho at 589, 635 P.2d 254.

The State in this case, in all of its component parts, even had it moved to be relieved of its stipulation, would be hard pressed indeed to exhibit any justification for its mistake. The best that I can make of the State's position is that it, in the person of its prosecutor, simply failed to make inquiry of the most knowledgeable person in charge, in Boise, Richard Groff. It is only necessary to display two paragraphs of the affidavit of the prosecuting officer handling the case:

4. That in preparation for the argument and briefing on defendant's second Motion to Suppress, the State contacted representatives of the Lewiston Police Department and Robert J. Martin of the Idaho State Department of Health and Welfare Forensic Laboratory in Coeur d'Alene, who is responsible for the calibration and certification of the Intoximeter 3000 located at the Lewiston Police Department, and inquired of both whether the Lewiston Police Department was a laboratory under Idaho Code Section 18–8004(4).

5. The State was informed at that time that to the best of these sources' knowledge, the Lewiston Police Department was not a laboratory.

R., Vol. II, 109. Only after receiving the adverse oral ruling on October 27, 1987, which Justice Johnson mentions, did the State make what was at all times the easy effort to contact a readily available source, in fact, a veritable fountain of information. From that same affidavit:

7. That after the court's ruling granting defendant's second Motion to Suppress dated October 27, 1987, the State contacted Richard Groff, Supervising Criminalist for the Bureau of Laboratories of the Department of Health and Welfare, who informed your affiant that he had in his possession, what is attached hereto and marked as EXHIBIT "A", a

list showing the Lewiston Police Department to be a certified laboratory for breath testing only.

R., Vol. II, 109. That affidavit is dated October 30, 1987, hence within three short days of obtaining the adverse ruling, and the affiant had no trouble in getting the list sent to him in Lewiston. No explanation was ever tendered for not having obtained the list in time for the suppression hearing.

The trial judge who presided has been at the practice of law for over forty years. It is not surprising that he also knows that stipulations once made are controlling until, *on motion*, a party is relieved therefrom. Surely no one will suggest that a fair and impartial judge would ignore the State's failure to move for relief. The judge, if deeming himself part of "the State" might have advised "the State" of the need to have the stipulation set aside. In a criminal action, the trial court cannot take sides.

Moreover, the Lewiston Police Department is *not* on the list of approved forensic alcohol *laboratories*. There are only nine forensic alcohol laboratories, which consist of six major hospitals in the state, and state-operated labs in Boise, Pocatello, and Coeur d'Alene. *See* Exhibit A to the affidavit of the prosecutor, copy of which is attached hereto as Appendix A.

Of more importance note from the exhibit that in all of the "*SITES* CERTIFIED FOR BREATH ONLY," there are no "Laboratory Supervisors" as such are indicated as to the forensic alcohol laboratories, but rather there are just plain "supervisors," all of whom are either county sheriffs or police chiefs, other than Mountain Home which has an officer-in-charge. The State presented no evidence that any of those forty or more sheriffs are lab technicians.

Note also that Bob Martin is the supervisor of the state-operated laboratory at Coeur d'Alene. He is also one and the same as Robert J. Martin, referred to in the prosecutor's affidavit, paragraphs (4) and (5) of which appear above. He, Bob Martin (aa Robert J. Martin), full well knew what

he was about when he told "the State"[3] that the Lewiston Police Department was not a laboratory. Mr. Martin is also notably reported as being a laboratory supervisor, in charge of the Coeur d'Alene office, whose duties included being responsible for the calibration and certification of the Intoximeter located at the Lewiston Police Department.

Richard Groff, the possessor of Exhibit A, actually stated nothing whatever in connection with this facet of the case. At best, he is reputed as having told the prosecutor that he "had in his possession ... a list showing the Lewiston Police Department to be a certified laboratory for breath testing only."

Clearly the trial court was correct in ignoring the State's suggestion that he hold a second hearing on this issue at which new evidence could be introduced. One trial of an issue is ordinarily enough. Absent a well grounded motion to be relieved of the stipulation, the trial court was not in error in proceeding to enter his thorough, thoughtful, and well-worded set of findings of fact and conclusions of law. It would be error on the part of an appellate court to interfere under the circumstances here presented.

Moreover, it is suggested that there is no reason why this Court should treat this case differently from any other. The State, it is likely true, dislikes losing. But here it has earned its loss, and as all practitioners learn, there is much to be learned in losing. As we were informed at oral argument, when the State took this appeal from the interlocutory order of suppression, it had no obligation to do so—purely a matter of choice by the deputy attorney general who filed the notice. We were advised that no stipulation was obtained from the defense to waive the right to a speedy trial while this narrow issue was pursued. Many are the defendants who have been convicted of DUI on the testimony of observing witnesses, including law enforcement officers. As stated, a calculated choice was made in Boise, albeit perhaps at the prosecutor's request being of no moment. On the state of the record, the decision to appeal from the suppression order was made, instead of going on to trial, was questionable. A majority of this Court may be seen by the trial bench and bar as coming to the rescue of the State, if the trial court ruling is overturned.

## THE BASIC ISSUE AT STAKE HERE IS WHETHER THE INTOXIMETER AS MODIFIED IS RELIABLE—NOT WHETHER IT HAS BEEN APPROVED.

JUSTICE JOHNSON: Just to wrap up this dialogue which is puzzling to me because what I hear you arguing for is that we should, by our decisions, supplant the authority that was given to the Department of Health and Welfare to determine the approval of the instrument to be used for breath testing and allow the district courts of this state to become the final authority on what is the approved equipment. Now, if I have mischaracterized your argument, I hope you'll correct me.

MR. CLARK: Well, I think that the issue is that the court, as far as admissibility of evidence, is always the final authority; *and whether or not the Department of Health and Welfare or any other agency has properly followed its delegated responsibility from the Legislature, as far as whether the evidence is going to be admitted, and whether they have acted properly pursuant to their authority, is generally a question ultimately for a court, and ultimately for this Court.* I think the issue, as I perceive it right now, is larger than the narrow issue before Judge Ponack. I think that there is an alternate grounds here that *this Court should consider also in deciding this,* and that is *whether or not the Lewiston Police Department was an approved laboratory,* because the regulations and the statute

---

**3.** As time goes by, one may expect that "the State" will be better identified. The State can only act through its officers and officials; hence a trial court could exclude from consideration affidavits which are not explicit as to who said what and to whom.

both require that the Lewiston Police Department be an approved laboratory. The Officer Stewart—the only officer that testified at the time of the hearing testified that he wasn't aware any place in the Lewiston Police Department was designated by the Department of Health and Welfare as a forensic laboratory. *The court in its findings said, based on stipulation of the state in open court, that* the court finds *the Lewiston Police Department and its premises was not* at the time of the defendant's arrest *an approved or certified breath alcohol testing laboratory.* Now the regulations of the Department of Health and Welfare said that a list had to be sent out to various agencies to say which was approved or what wasn't approved. In the affidavit of the state, it's clerk's record 109, says that in preparation for the argument on our motion that the state contacted representatives of the Lewiston Police Department, Robert J. Martin of the Idaho Department of H & W and the forensic laboratory in Coeur d'Alene who is responsible for the calibration and certification of this machine that was located at the Lewiston Police Department, and inquired of both whether the Lewiston was an approved facility and the state was informed at that time that to the best of these sources' knowledge the Lewiston Police Department was not a laboratory.

. . . .

JUSTICE JOHNSON: Mr. Clark, I need to follow-up on one procedural matter. After the trial court's initial decision in this matter, the state presented the list of approved laboratories and then there were further hearings, or a hearing

at least, and then as I read the record, the trial court issued its findings in which it said plaintiff's counsel having stipulated in argument, the court finds that Lewiston Police Department and its premises was not at the time of the defendant's arrest an approved or certified direct breath alcohol testing laboratory. *Do you read then* the procedural record to indicate *that in effect he rejected the offer of that list* since it had been filed before those findings were issued, as I read the record.

MR. CLARK: If it was filed before the findings were issued, I think you would be right. I am not—again I would have to check the record to verify the sequence in which things were done. I know that Mr. Groff's affidavit was filed sometime after the findings and I am not sure about that. He also had the direct testimony of Officer Stewart, the breath testing specialist, with respect to that issue also.[4]

Mr. Clark was eminently correct in fielding both questions from the bench during oral argument. Many are the cases this Court has heard wherein an enterprising young attorney whose grandfather was a Supreme Court Justice, successfully took many, if not most, of the State's large agencies and departments to task for not staying within their delegated authority, or for violating their own self-promulgated rules and regulations.

A most bothersome aspect to this case, and undoubtedly a concern of the trial court, is the unusual and questionable manner in which "the State" purported to recertify or reapprove the Intoximeters after deactivation of the Taguchi Cells. The trial

---

4. Mr. Stewart's testimony was as follows:
Q  Do you have any certification that's been issued by the State of Idaho declaring the area—any area within the Lewiston Police Department as a forensic alcohol laboratory?
A  I'm not aware of any document from the forensic lab declaring a particular area of Lewiston Police Department facility as being, as you refer to, the approved lab area. No, I have not. I got no document of that type.
Q  Has anyone ever communicated to you that a part of the Lewiston Police is the forensic alcohol laboratory?

A  When they—when they—I should say Mr. Stan McGee from the forensic lab, I believe, is the one that came down and actually deactivated the Taguchi Cell. He did see our configuration in the building at the time as far as its placement next to the radio room, and that type of thing. As far as I know, he made no objection to its particular location. But as to whether he called it quote, unquote, the approved lab area, I have no idea, Mr. Clark.

court refrained from commenting, but there is no reason why it should go unmentioned.

The court's findings set out the history of the certification and approval procedures taken when the Intoximeter 3000 were purchased and put into service. Specifically therein noted is the memorandum of Dr. Darrell Brock, which did so. The findings point to "the State's" decision to deactivate the Taguchi cell, following which there was no further specific approval or certification, although the State continued to utilize the intoximeters. Findings IX and X relate how the modified instrument is inaccurate, and why.

The untold story not set out in the findings is as follows: When the decision was made by Rick Groff to eliminate the bothersome Taguchi Cell, he wrote to the manufacturer under date of June 28, 1984, his *feelings*, his *problem*, his *understanding*, and *sending a proposed* letter which he wanted Cal Detect, Inc. to send to him, attached hereto as Appendix B and Appendix C. The manufacturer obliged Mr. Groff, and wrote the letter on its stationery, the President signing the same, a copy of which is attached hereto as Appendix D.

This procedure of telling the manufacturer what to write to Health and Welfare is unacceptable. The manufacturer does not say that it has done any testing which allows it to write the letter which goes into Mr. Groff's file. Nor is there any showing that Mr. Groff or anyone for the state of Idaho has done any such testing.

It all comes back to the assertion found in the State's brief, page 16, "Mr. Groff, manager of the Forensic Section of the Idaho Department of Health and Welfare's Bureau of Laboratories, testified that the management of the bureau *felt* that certification of the Intoximeter 3000 after deactivation of the Taguchi Cell was not required." R., 162–164. That "testimony" was not testimony given in Judge Ponack's court—which raises another interesting issue which Justice Johnson's opinion does not discuss. The so-called testimony was given in another case before another judge. It was transcribed, however, and a copy of the transcription was filed in the record in Wilson's case, being attached as an exhibit to the prosecutor's affidavit filed in support of the prosecutor's motion for reconsideration. The motion itself had best be exposed in its entirety:

COMES NOW, David E. Dokken, Deputy Prosecuting Attorney for Nez Perce County, Idaho, and moves the above-entitled Court for an order to reconsider it's order on defendant's second Motion to Suppress filed on February 29, 1988.

Said motion is made and based upon the grounds that *new evidence has come to light* as evidenced by the State's Affidavit in support of this motion in which the State feels would have substantial bearing on the Judge's initial ruling in this case, *as follows:*

1. That as indicated by the affidavit attached to the State's first Motion for Reconsideration, the Lewiston City Police Department is a certified laboratory.

2. *That Richard Groff,* Supervising Criminalist for the Bureau of Laboratories of the Department of Health and Welfare *would testify* that the deactivation of the Taguchi Cell would not modify the technical configuration of the Intoximeter 3000.

3. That *Richard Groff would testify* that for all times relevant to the instant case, the Intoximeter 3000 was the approved direct breath testing device in the State of Idaho.

*The State further requests* oral argument and *the opportunity to present* more briefing and *evidence* on this defendant's second Motion to Suppress.

R., 137–138. It is readily observed that the prosecutor desired a second opportunity to prove the case which he did not put on at the hearing on the suppression motion. Desire, however, is not a street car which can take one anywhere in trying law suits. Mr. Groff had not testified in this case. He "would" testify if the court below had been willing to disregard all established rules, and let the State have a second opportunity. The trial bar will surely be at a loss to understand why it is a majority of members the Idaho Supreme Court are all

unwilling to inquire as to the proceedings which took place.

At a hearing on March 29, 1988, with counsel present, the trial court took up the motion for reconsideration and expressed itself as to the filed and tendered transcript of Mr. Groff's testimony:

THE COURT: I just want to make a few observations.

Mr. Dokken, perhaps you can answer what is the reluctance of the Department to recertify?

MR. DOKKEN: The Intoximeter 3000?

THE COURT: Yes.

MR. DOKKEN: Well, Your Honor, in this situation, my understanding is that as Mr. Groff testified, they truly believe that the configuration · contemplated in that memo did—wasn't changed.

THE COURT: But they're just standing on their belief that they're right?

MR. DOKKEN: Well, *they feel their grounds of authority* in this situation to approve the Intoximeter 3000 *extends to what they understand their own approval to mean.* And in that situation, their approval meant whether it had a keyboard or didn't it. Since they didn't take a keyboard away, they didn't feel they needed to reapprove it.

THE COURT: Very well. *Referring first to the transcript of the testimony of Mr. Groff, you would be asking the Court to take the testimony of another witness in another case before another judge without the benefit of cross-examination.*

R., 58.

Reluctantly I am brought to the conclusion that Part II of the majority opinion may be premised largely on sheer *ipse dixit* wherein it is stated on page 4, "In 1985, the supervising criminalist of forensic section of the bureau of laboratories of the Department directed that the Taguchi cell on each Intoximeter in service in Idaho be deactivated." Although there follows a seven line paragraph which may purport to justify the naked declaration, and conceding that I may be somewhat remiss in my abilities at comprehending technical matters, this supposedly explanatory paragraph only heightens my concern. In particular I refer to the statement that, "The Department has approved the Intoximeter with the Taguchi cell deactivated" which statement does not refer the reader to a supporting source.

The best which I presently can make of this circumstance is *ipse dixit* supported by *ipse dixit.* Justice Johnson makes no reference to post-deactivation of the Taguchi cell testing. He may have in mind the transcript of Mr. Groff's testimony given in another case, but it would be inappropriate for this Court to utilize it when we know that the district court did not, and why the district court did not. That Groff transcript, I am sorry to say, appears to be the only source to which Justice Johnson must have turned. That I set out a portion of the transcript of the Groff testimony is not to be taken as my endorsement of the majority's improper use thereof.[5] Having persued it a number of times, I see it is as simply Mr. Groff's pronouncement that the Department of Health and Welfare has free reign to do, and *it* approves of its handiwork. The trial bench and bar, and any interested reader—all are entitled to know from whence this approval stemmed:

"Q Now, at the time that the department made a decision to—a formal decision to deactivate the Taguchi cell, did you discuss this deactivation procedure with the manufacturer?

"A Yes, we did.

"Q Was this a strictly formal memo-to-memo type situation or were there informal contacts and conversations?

"A There was quite a bit of informal contact. Necessarily, there had to be.

"Q And before the Taguchi cell was deactivated in the State of Idaho, did you

---

**5.** The Attorney General's Solicitor General, and the Deputy Attorney General who filed the appeal and authored the State's brief are justly entitled to severe criticism for incorporating references to the Groff transcript into the State's brief, pages 18–19. By so doing, it may be they who are responsible for misleading Justice Johnson.

request instructions or concurrents from the manufacturer?

"A Yes.

"Q And did you receive concurrency in terms of that modification?

"A On two different occasions we have.

"Q All right. Now, we have already admitted into evidence, I believe, it's Defendant's 3 which is the memorandum from Cal Detec?

"A That's right.

"Q This would be a letter dated in July of 1984?

"THE COURT: I've got 5 is from—

"MR. LAMBERT: Mr. Hudson?

"THE COURT: I have that as 5.

"MR. MUSHLITZ: 3 is that one (indicating).

"BY MR. LAMBERT:

"Q As to Defendant's 5, the letter from Mr. Hudson of Cal Detec, do you personally know Mr. Hudson?

"A Yes.

"Q Well, first of all, what is his function with the company Cal Detec?

"A He's no longer employed by them. But the Department of Health and Welfare?

"THE WITNESS: You're asking me the question?

"THE COURT: Yes.

"THE WITNESS: Yes.

"MR. MUSHLITZ: Your Honor, I would mention that he has previously testified that it was approved in the configurations with the Taguchi cell in operation, identified that approval as that exhibit, and said there hasn't been anything subsequent.

"THE COURT: I heard his testimony. Now, you heard counsel's last comments.

"THE WITNESS: Yes, I did.

"THE COURT: You responded earlier, I believe, to counsel by saying that there had been no approval of any new configuration; is that correct?

"THE WITNESS: Had we re-approved it and I said yes. He asked me that and I said no.

"THE COURT: That you had not re-approved changing configuration?

"THE WITNESS: Correct.

"THE COURT: Now, in fact, that particular response is consistent with your response that at this point in time, Mr. Hudson was the one who developed the prototype of the Intoximeter 3000 as president of Cal Detec, and he was still president of that corporation.

"Q Did you solicit from Cal Detec a procedure or an approval?

"A Yes, I did.

"Q And does that memo adequately reflect the correspondence between yourself and Mr. Hudson at that time?

"A At that time, yes, it does.

"Q Based upon that and your own test, the policy decision to deactivate the Taguchi cell was made?

"A Yes.

"Q Subsequent to that time, have you received any other correspondence—

"THE COURT: Excuse me. While we're right there, let me just ask one quick question. The decision to deactivate the Taguchi resulted in having a new machine, arguably anyhow. Now, it's a different thing that's come about. Let's refer to that deactivated—the Intoximeter 3000 without the Taguchi cell being activated, was that instrument in that state approved by the Idaho Department of Health and Welfare approved the use of the Intoximeter without the Taguchi cell being activated; correct? I'll say it again. Is your statement to the effect that the Health and Welfare department did not approve a changing configuration? Is that statement consistent with your statement that health and welfare did, in fact, approve the use of the Intoximeter 3000 without the Taguchi cell being activated?

"THE WITNESS: Yes, it is; but I have to explain, your Honor.

"THE COURT: Let me just ask you. Is that because configuration has nothing to

do with whether or not the taguchi cell is activated or deactivated?

"THE WITNESS: It has to do with our—if the basis for our approval. We approve an instrument, the Intoximeter 3000. Configuration we talked about in this memo does not talk about electronic, internal electronic operation of an instrument.

"THE COURT: Again, answer my question.

"THE WITNESS: Okay.

"THE COURT: The configuration of the Intoximeter 3000 is the same with the taguchi activated or the Taguchi cell deactivated; correct?

"THE WITNESS: As I'm referring to it in this, yes.

"THE COURT: All right. We admit that once you deactivate the Taguchi cell, however, it's, in fact, a different machine?

"THE WITNESS: Yes.

"THE COURT: However, with reference to the different machine, the Idaho Department of Health and Welfare, as I understand it, did, in fact, approve that new machine? When I say "new machine," I mean the Intoximeter 3000 without the Taguchi cell; is that correct?

"THE WITNESS: I have to say that we didn't feel that re-approval was necessary.

"THE COURT: Did health and welfare approve the use of the Intoximeter 3000 without the Taguchi cell being activated?

"THE WITNESS: Well, yes, of course we did.

"THE COURT: That's what I'm trying to find out. You just told me a second ago that you didn't feel it was necessary?

"THE WITNESS: Well, I guess you're asking me yes or no questions; and I just can't amplify. I'm sorry. And I think we're talking in different terms.

"THE COURT: Let's try to work that out. First of all, we're in agreement that the term 'configuration' does not or is not affected by whether or not the taguchi cell is activated or deactivated. Configuration means a choice of options, for instance, like a keyboard; is that correct?

"THE WITNESS: Yes.

"THE COURT: Now, there came a time when there was some discussion about whether or not the Intoximeter 3000 should be used without the Taguchi cell in operation; is that correct?

"THE WITNESS: Correct.

"THE COURT: A decision was made by the Idaho Department of Health and Welfare to deactivate the Taguchi cell from the Intoximeter 3000; is that correct?

"THE WITNESS: That's correct.

"THE COURT: You were then using an Intoximeter 3000 without a Taguchi cell being activated. I want to know if that particular instrument, if the use of that instrument was approved by the Department of Health and Welfare? And if you can't answer it "yes" or "no," answer it in any way you'd like.

"THE WITNESS: Okay. Yes, it was approved by Health and Welfare; but it's not a simple yes or no question. Its original approval, as I've talked about, was not based on some specific electronic exact arrangement. That's changed several times over past years. What we did is to approve, in fact, to my knowledge, the exact configuration that was approved. The options that were approved is not written down, anyway. I would have to guess what those are. But what we did is to approve a device for breath testing in Idaho which both the law requires us to and our own rules and regulations require us to, and we felt like and feel like we've approved that instrument. We can make changes in it as long as the instrument is still approved by us at our option. We have done that. I'm answering, yes, we have made changes and they were approved because we feel like they were really not a part of our approval process. We approved it as a device, the Intoximeter 3000, for use in Idaho. The manufacturer has made numerous changes in it, and we've made one ourselves.

"THE COURT: And so the change that we have in the Intoximeter 3000 that was

used in this case was the elimination of an active Taguchi cell; correct?

"THE WITNESS: That's one of the changes.

"THE COURT: And that was approved by Health and Welfare?

"THE WITNESS: Yes.

"THE COURT: You did not approve the elimination of the infrared detection unit from the Intoximeter 3000? As I understand it, the Intoximeter 3000 has two aspects to it, an infrared detection unit; is that correct?

"THE WITNESS: That's correct.

"THE COURT: And a test for acetone and I think that's what we call the Taguchi cell; is that right?

"THE WITNESS: Yes.

"THE COURT: Did health and welfare at the time and place in question and that is when?

"MR. LAMBERT: April 18, 1985.

"THE COURT: April 18, 1985, approve the Intoximeter 3000 without the Taguchi cell being activated?

"MR. MUSHLITZ: Could we clarify? Are you requesting whether or not they formally approved it in writing or whether or not there was some discussion?

"THE COURT: Was its use approved? Let me ask it this way. Was its use approved by the Idaho Department of Health and Welfare?

"THE WITNESS: Yes, it was. We made the changes, initiated the memo. Yes, it was.

"THE COURT: All right. Now, that particular change that you approved was discussed by various people including yourself and the Idaho Department of Health and Welfare; is that correct?

"THE WITNESS: That's correct.

"THE COURT: Did the supervisor of blood and breath alcohol testing of the forensic section approve the use of the Intoximeter 3000 without the Taguchi cell being activated?

"THE WITNESS: Yes, he did. He wrote—I don't know if any of them are here today, but he wrote several memos in that regard; and he was actively involved in making those changes on the instrument.

"THE COURT: And, in fact, did the Department of Health and Welfare develop a procedure by which that change would be accomplished?

"THE WITNESS: Yes.

"THE COURT: And to your knowledge, was that procedure adopted in this particular case with reference to 1401?

"THE WITNESS: It was done statewide; so I'm sure it was, your Honor, although I was not directory involved.

"THE COURT: You may proceed.

"MR. LAMBERT: Your Honor, I have no other questions at this time; and I would reserve the right to re-call Mr. Groff at a future time.

"THE COURT: Thank you. You may proceed.

"MR. MUSHLITZ: May I approach the bench?

"THE COURT: Yes."

APPENDIX A

Revised: January 1987

1987 FORENSIC ALCOHOL LABORATORIES

LABS CERTIFIED FOR BLOOD, BREATH, AND URINE

| | | |
|---|---|---|
| Boise Forensic Lab | Supervisor—Rick Groff | Methods used: Gas Chromatography and/or Smith–Widmark |
| Pocatello Forensic Lab | Supervisor—Don Wyckoff | Methods used: (Same) |
| Coeur d'Alene Forensic Lab | Supervisor—Bob Martin | Methods used: (Same) |

LABS CERTIFIED FOR BLOOD AND URINE

| | | |
|---|---|---|
| Bannock Memorial—Pocatello | Laboratory Supervisor | Methods used: Enzyme |
| Bingham Memorial—Blackfoot | Laboratory Supervisor | Methods used: Enzyme |

| | | |
|---|---|---|
| Magic Valley Regional Medical Center—Twin Falls | Laboratory Supervisor | Methods used: Enzyme |
| St. Alphonsus—Boise | Laboratory Supervisor | Methods used: Enzyme |
| Riverview—Idaho Falls | Laboratory Supervisor | Methods used: Enzyme |
| Pocatello Regional Medical Center | Laboratory Supervisor | Methods used: Enzyme |

SITES CERTIFIED FOR BREATH ONLY

| | | |
|---|---|---|
| Ada County/Boise Police Dept. | Supervisor—Sheriff | Methods used: Intoximeter 3000 & Intoxilyzer 5000 |
| Adams CSO/Council P.D. | Supervisor—Sheriff | Methods used: Alco–Sensor III only |
| Arco P.D. | Supervisor—Chief | Methods used: Alco–Sensor III only |
| Bannock County/Pocatello P.D. | Supervisor—Sheriff | Methods used: Intoximeter 3000 only |
| Benewah CSO/St. Maries P.D. | Supervisor—Sheriff | Methods used: Alco–Sensor III only |
| Bingham County/Blackfoot P.D. | Supervisor—Sheriff | Methods used: Intoximeter 3000 only |
| Blaine CSO/Hailey P.D. | Supervisor—Sheriff | Methods used: Intoximeter 3000 only |
| Boise County | Supervisor—Sheriff | Methods used: Alco–Sensor III only |
| Bonner County/Sandpoint P.D. | Supervisor–Sheriff | Methods used: Intoximeter 3000 only |
| Bonneville County/Idaho Falls P.D. | Supervisor–Sheriff | Methods used: Intoximeter 3000 only |
| Boundary County/Bonners Ferry P.D. | Supervisor–Sheriff | Methods used: Intoximeter 3000 only |
| Buhl Police Dept. | Supervisor–Chief | Methods used: Intoximeter 3000 only |
| Canyon County/Caldwell P.D. | Supervisor–Sheriff | Methods used: Intoximeter 3000 only |
| Caribou County/Soda Springs P.D. | Supervisor–Sheriff | Methods used: Intoximeter 3000 only |
| Cassia County/Burley P.D. | Supervisor–Sheriff | Methods used: Intoximeter 3000 only |
| Clark County/Dubois | Supervisor–Sheriff | Methods used: Alco–Sensor III only |
| Clearwater County/Orofino P.D. | Supervisor–Sheriff | Methods used: Intoximeter 3000 only |
| Coeur d'Alene Police Dept. | Supervisor–Chief | Methods used: Intoximeter 3000 only |
| Custer County | Supervisor–Sheriff | Methods used: Alco–Sensor III only |
| Elmore County/Mt. Home P.D. | Supervisor–Sheriff | Methods used: Intoximeter 3000 only |
| Fort Hall Police Dept. | Supervisor–Chief | Methods used: Intoximeter 3000 only |
| Franklin County/Preston P.D. | Supervisor–Sheriff | Methods used: Intoximeter 3000 only |
| Freemont County/St. Anthony P.D. | Supervisor–Sheriff | Methods used: Intoximeter 3000 only |
| Gem County/Emmett P.D. | Supervisor–Sheriff | Methods used: Intoximeter 3000 only |
| Gooding County/Gooding P.D. | Supervisor–Sheriff | Methods used: Intoximeter 3000 only |
| Grangeville Police Dept. | Supervisor–Chief | Methods used: Alco–Sensor III only |
| Horseshoe Bend P.D. | Supervisor–Chief | Methods used: Alco–Sensor III only |
| Idaho County/Kooskia P.D. | Supervisor–Sheriff | Methods used: Alco–Sensor III only |
| Jefferson County/Rigby P.D. | Supervisor–Sheriff | Methods used: Intoximeter 3000 only |
| Jerome County/Jerome P.D. | Supervisor–Sheriff | Methods used: Intoximeter 3000 only |
| Kellogg Police Dept. | Supervisor–Chief | Methods used: Alco–Sensor III only |
| Ketchum P.D./Blaine County | Supervisor–Chief | Methods used: Alco–Sensor III only |
| Kootenai County | Supervisor–Sheriff | Methods used: Intoximeter 3000 only |
| Latah County/Moscow P.D. | Supervisor–Sheriff | Methods used: Intoximeter 3000 only |
| Lewis County/Nez Perce P.D. | Supervisor–Sheriff | Methods used: Alco–Sensor III only |
| Lewiston Police Dept. | Supervisor–Chief | Methods used: Intoximeter 3000 only |
| McCall Police Dept. | Supervisor–Chief | Methods used: Alco–Sensor III only |
| Minidoka County/Rupert P.D. | Supervisor–Sheriff | Methods used: Intoximeter 3000 only |
| MHAFB/Mountain Home | Supervisor–Officer in charge | Methods used: Intoximeter 3000 only |
| Nampa Police Dept. | Supervisor–Chief | Methods used: Intoximeter 3000 only |
| Oneida County | Supervisor–Sheriff | Methods used: Alco–Sensor III only |
| Owyhee County | Supervisor–Sheriff | Methods used: Alco–Sensor III only |
| Payette County/Payette P.D. | Supervisor–Sheriff | Methods used: Intoximeter 3000 only |
| Power County/American Falls P.D. | Supervisor–Sheriff | Methods used: Intoximeter 3000 only |
| Rathdrum Police Dept. | Supervisor–Chief | Methods used: Alco–Sensor III only |
| Rexburg P.D./Madison County | Supervisor–Chief | Methods used: Intoximeter 3000 only |
| Salmon P.D./Lemhi County | Supervisor–Chief | Methods used: Alco–Sensor III only |
| Shelley Police Dept. | Supervisor–Chief | Methods used: Alco–Sensor III only |
| Shoshone County/Wallace P.D. | Supervisor–Sheriff | Methods used: Intoximeter 3000 only |
| Shoshone P.D./Lincoln County | Supervisor–Chief | Methods used: Alco–Sensor III only |
| Teton County | Supervisor–Sheriff | Methods used: Alco–Sensor III only |
| Twin Falls County | Supervisor–Chief | Methods used: Intoximeter 3000 only |
| Valley County/Cascade P.D. | Supervisor–Sheriff | Methods used: Alco–Sensor III only |
| Weiser Police Dept. | Supervisor–Chief | Methods used: Intoximeter 3000 only |

---

APPENDIX B

STATE OF IDAHO

DEPARTMENT OF HEALTH AND WELFARE

BUREAU OF LABORATORIES, 2220 Old Penitentiary Road, Boise, ID 83702 FORENSIC SECTION (208) 334–2231

June 28, 1984

Don Hutson
Cal Detect, Inc.
101 W. Nevin Ave.
Richmond, CA 94801
Dear Don:

Rather than change over to the modification of the Taguchi cell, we would prefer to quit trying to detect acetone altogether. We do not feel the amounts found justify

the effort. Our problem is that the instrument has to be run according to the instructions supplied by the manufacturer because of our rules and regulations.

The manual supplied by Cal Detect implies that the instrument must be run with the Taguchi cell working properly. My understanding of the instrument is that the Intoximeter 3000 will properly quantitate alcohol even though the Taguchi cell is deactivated. It simply will not detect and subtract acetone when operated in this manner.

If my understanding is correct, could you please do two things for me? The first would be to call Kurt Scudder at (208) 334-2231 and tell him the best way to deactivate the Taguchi cell. The second thing would be to send me the enclosed letter modified to accurately represent your position on your own letterhead. The thrust of this letter would be that the Intoximeter 3000 would be operated according to the manufacturer's instructions with the acetone detector deactivated.

Yours truly,
(s) Rick Groff
Rick Groff

RG:eh

Enclosure

cc: Mac Forrester

### APPENDIX C

Dear Rick:

The Intoximeter 3000 is supplied with a Taguchi cell that is capable of detecting acetone if present and subtracting the contribution that it makes to the quantitation of alcohol by the infrared detector. An available modification of the Taguchi cell makes the cell even more specific. However, there is a fair amount of effort in keeping the original version of the Taguchi cell or its modification working properly. The Intoximeter 3000 gives accurate results for alcohol if the Taguchi cell is deactivated. Acetone, if present in a drinking subject, could contribute at most .015% on the Intoximeter 3000 expressed in units of

grams of alcohol per 210 liters of breath when the Taguchi cell is deactivated.

Therefore, the instructions from the manufacturer of the Intoximeter 3000 for obtaining samples for direct breath alcohol analysis are offered with various options. One option is to run the instrument with the Taguchi cell operating and calibrated to detect and subtract acetone. Another option for operating the instrument according to the instructions of the manufacturer is to operate the Intoximeter 3000 with the Taguchi cell deactivated. With the Taguchi cell deactivated, the instrument will not react to acetone. Therefore, in running the instrument in this mode, the operator does not need to blow six simulator solutions when the instrument is programmed or when acetone is detected. (Acetone would never be detected in this mode.)

Yours truly,
Don Hutson

cc: Mac Forrester

### APPENDIX D

CalDetect, Inc.

*101 W. Nevin Avenue*

*Richmond, CA 94801*

*(415) 235-4087*

July 9, 1984

Mr. Rick Groff
State of Idaho
Department of Health and Welfare
2220 Old Penitentiary Road
Boise, ID 83702

Dear Rick:

The Intoximeter 3000 is supplied with a Taguchi cell that is capable of detecting acetone if present and subtracting the contribution that it makes to the quantitation of alcohol by the infrared detector. An available modification of the Taguchi cell makes the cell even more specific. However, there are extra calibration steps required periodically to insure that either Taguchi cell version is working properly. The Intoximeter 3000 gives accurate results for alcohol if the Taguchi cell is deactivated. Acetone, if present in drinking subject,

could contribute at most .015% on the Intoximeter 3000 expressed in units of grams of alcohol per 210 liters of breath when the Taguchi cell is deactivated.

Therefore, the instructions from the manufacturer of the Intoximeter 3000 for obtaining samples for direct breath alcohol analysis are offered with various options. One option is to run the instrument with the Taguchi cell operating and calibrated to detect and subtract acetone. Another option for operating the instrument according to the instructions of the manufacturer is to operate the Intoximeter 3000 with the Taguchi cell deactivated. With the Taguchi cell deactivated, the instrument will not descriminate against acetone. Therefore, in running the instrument in this mode, the operator does not need to blow six simulator solutions when the instrument is programmed or when the acetone is detected. (Acetone would never be detected in this mode).

Sincerely,
(s) Donald G. Hutson
Donald G. Hutson
President
CalDetect, Inc.

DGH:ko