730 P.2d 996

**Michelle SIDWELL, Plaintiff-Appellant,**

v.

**WILLIAM PRYM, INC., a Delaware corporation, Defendant-Respondent,**

and

**Smiths Management Corp., a Utah corporation, Defendant.**

**No. 16307.**

Supreme Court of Idaho.

Dec. 19, 1986.

---

Ronald S. George, Morgan & George, Pocatello, for plaintiff-appellant.

William D. Olson, Pocatello, for defendant-respondent.

SHEPARD, Justice.

This is an appeal from a judgment in favor of defendant, entered following a directed verdict at the conclusion of plaintiff's case in a product liability case. Appellant asserts that the trial court erred in directing a verdict in favor of the defendant, and also erred in excluding certain proffered testimony of plaintiff's expert witness. We affirm.

Plaintiff Sidwell was wearing a dress, and her mother was using pins to place a hem in the dress. When Sidwell bumped or brushed against a coffee table the impact drove a pin into her knee area with sufficient force to strike the end of her femur. The pin broke into three pieces, two of which remained in the knee. One of those fragments was surgically removed, but the other had lodged in the bone and since its removal would cause permanent impairment of the knee, it was not removed. There has been resultant pain and a serious curtailment of the activities of Sidwell. The pins were manufactured by Prym and were sold by Smith's.

Sidwell has alleged that the pins were defective and unusually dangerous, that they were defectively designed, and that there was a duty to warn of the brittle nature of the pins. Sidwell asserted that the pins in question here differ from common ordinary pins used in dressmaking. She asserts that common ordinary pins are made from a material which is ductile, and hence the pins will bend when placed under stress. The pins at issue here, however, are made from a different type of material which is not ductile and hence are brittle, with a tendency to break rather than bend when placed under stress.

Albeit the verdict was directed at the conclusion of plaintiff's case, and therefore the defense presented no evidence as such, plaintiff called an officer of the defendant who testified at length regarding the pins. While plaintiff called that witness for cross-examination, and hence is not bound by that testimony, nevertheless that testimony is in the record, is before us, and is uncontroverted. That testimony, as well as all the other testimony, indicates that the pins in question here were labeled and sold as "needle-steel" pins. The metal used in the manufacturing process is of hardened tempered steel so it can be drawn to a thousandth of an inch. The pins are longer and thinner than common pins, are sold for use on fine materials, and hence the points are much sharper than a common pin so that the fine materials will not be damaged.

They are brass plated and colored and designed to resemble as closely as possible a hand-sewing needle. In order to achieve the above purposes, hardened tempered steel is used because those purposes cannot be achieved with a low-carbon steel. Ordinary common pins are made from a low-carbon steel which is ductile when drawn. The type of pins here are brittle because of the inherent nature of the material from which they are made. The pins in question are manufactured by Prym in Europe, and during the years they have been manufactured Prym has sold billions of those pins. Although popular in Europe, only approximately five percent of the dressmaking pins sold in the United States are of the Prym type of needle-steel pins.

As above noted, Sidwell asserts that the trial court erred in directing a verdict for Prym at the conclusion of plaintiff's case. On a motion for a directed verdict the moving party admits the truth of the adverse party's evidence and every legitimate inference that may be drawn therefrom. *Fousch v. Chrysler Motors Corp.*, 107 Idaho 701, 692 P.2d 345 (1984). A directed verdict should only be granted when the evidence is so clear and undisputed that all reasonable minds must reach the same conclusion. *Shields & Co., Inc. v. Green*, 100 Idaho 879, 606 P.2d 983 (1980); *Thomas Helicopters, Inc. v. Spray-Rite, Inc.*, 102 Idaho 567, 633 P.2d 1145 (1981). A motion for directed verdict presents a trial judge with a pure question of law, *i.e.*, whether, as a matter of law, plaintiff produced sufficient evidence (not a mere scintilla) from which reasonable minds could conclude that a verdict in favor of the plaintiff was proper. Upon appeal the standard of review is the same, *i.e.*, to determine whether as a matter of law plaintiff produced sufficient evidence from which reasonable minds could conclude that a verdict in favor of the plaintiff was proper. *Gmeiner v. Yacte*, 100 Idaho 1, 592 P.2d 57 (1979); 9 Wright & Miller, *Federal Practice and Procedure* §§ 2524, 2536 (1971).

It is also stated in *Gmeiner, supra,* and Wright & Miller, *supra,* that although the court has power to grant a directed verdict at the close of plaintiff's case, the better and safer practice is to defer a ruling upon the motion until both sides have finally rested. It is also stated that even at the close of all the evidence it may be desirable to refrain from directing a verdict and submit the cause to the jury. Thereafter, on appellate review, if it is determined the trial court was in error in its appraisal of the evidence, judgment on the verdict can be entered without the need for an entire new trial.

We thus review the record to determine if Sidwell produced sufficient evidence upon which reasonable minds could find in favor of Sidwell. The evidence must be viewed in the light most favorable to Sidwell. In any event, the evidence is essentially uncontroverted. At this juncture there is no question but the accident happened and that Sidwell suffered some damage therefrom. While there is some conflict in the evidence as to whether Sidwell's complaints of disability result from the accident at issue here, or from other causes, at this juncture that conflict must be resolved in favor of Sidwell.

The uncontroverted evidence reveals that in order to obtain the thin profile and their sharp point, the "needle-steel" pins had to be manufactured from a material which was not ductile, *i.e.*, they would break rather than bend under pressure. It is the focus of Sidwell's contention that such lack of ductility or "brittle design" poses "a danger to anticipated users that could only be eliminated by taking the pins off the market or providing a proper warning."

This Court has stated in *Rindlisbaker v. Wilson*, 95 Idaho 752, 759, 519 P.2d 421, 428 (1974):

It is clear that a failure to warn may be used as a basis for a strict liability case. Comment H, Restatement Torts 2d, § 402A, provides that where the defendant has "reason to anticipate that danger may result from a particular use" of his product and he fails to give adequate

warnings of such a danger, "a product sold without such warning is in a defective condition." This rule, however, is limited to situations wherein the danger is not obvious.

In the instant case it is clear that the manufacturer could anticipate the danger of a pin pricking, puncturing, or piercing dressmaking or other materials or the bodily surface of a user. However, it is equally clear that such danger is as obvious to the user as it is to the manufacturer. Hence, there was no requirement that the manufacturer give notice of such a danger, and a jury could only have found that such danger was obvious.

The focus in the instant case, however, is not the danger of piercing or puncturing, but rather the danger that a pin will be driven into the body with such force that it strikes a bone and shatters because of its brittle nature. In this regard these pins are no different than many other objects such as a needle, a knife, or a pointed piece of lead in a pencil. All, no doubt, if driven into a solid object with sufficient force will break rather than bend.

It is argued that such pins and their brittle nature might pose a danger in different circumstances, *i.e.*, that the use of a sewing machine to stitch over the top of a row of such pins might fracture a pin and result in flying fragments. The evidence indicates, however, that billions of such pins have been sold throughout the world without any complaints or problems. Even plaintiff's own expert witness admitted that while billions of such pins have been sold, that he had no knowledge of any other accident or complaint of injury caused by such pins.

As noted by the Restatement, *supra*, a manufacturer may be liable for failure to give adequate warning when the manufacturer has "reason to anticipate that danger may result from a particular use" of the product. As noted in *Rindlisbaker, supra,* quoting from *Thomas v. General Motors Corp.,* 13 Cal.App.3d 81, 91 Cal.Rptr. 301 (1971), the manufacturer must anticipate the product being used "for the uses for which it is manufactured" or "by its probable use."

Here, the manufacturer it seems, could anticipate that a user might attempt in dressmaking to bend such a pin or attempt to sew over the top of such pins, and in either event a fracture might result.

In the instant case, however, the manufacturer is asked to anticipate not only that pins will pierce, but they will be driven into the body with such force as to strike a bone and thus shatter. The circumstances of this case have been described as a freak accident that probably could not be duplicated under any conditions. Defendant's knee and the dress material had to strike the coffee table at a precise point and angle, and with such force that the pin was driven into the knee area to a depth where it struck a bone. It is argued that such a series of events could never be experimentally duplicated. We hold as a matter of law that reasonable minds could not differ on the inability of Prym to foresee the danger that the pins would be thrust into the body with sufficient force to strike a bone and shatter. We hold therefore that reasonable minds could not differ on the duty of Prym to warn of a danger which could not be foreseen.

Sidwell also asserts error in the exclusion of certain testimony of her expert witness. That witness was a professor of metallurgy. That witness testified that he had tested the pieces of pin involved in the instant accident as well as other pins. He found the structure of the metal in the pin at issue here to be a heat-treated steel, and found that in bending they broke very easily. He testified that he compared such pins to those of common "mild-steel" pins and that the "mild-steel" pins were quite ductile and could be bent without breaking. He testified that the pins at issue here are brass coated, and are labeled as "super strength needle steel pins," and that they break with practically no bending. Following that testimony he was then asked if he had arrived at any conclusions "as to whether or not the pins in question, Exhibit

A which injured my client, are defective and/or unreasonably dangerous?"

At that point objection was made on several grounds, including that no proper foundation had been laid since the witness did not know the intent of the manufacturer or have any experience in the manufacturing field. It was also established on examination in aid of the objection that the witness did not know the intent of the manufacturer or "what he wanted to do with this particular product;" that he had never studied garment making or had ever been a seamstress; nor did he know whether any other manufacturers produced pins or needles with the same hardened tempered steel. At that point the objection was renewed on the basis of no proper foundation having been laid, and also on the basis that it invaded the province of the jury.

At that point the jury was excused for the purpose of making an offer of proof. During that offer of proof the witness rendered his opinion that the pins were defective and unreasonably dangerous, although they may be in the condition that the manufacturer intended. The witness also opined that appropriate warning might alleviate this defective and unreasonably dangerous condition. At the conclusion of the offer of proof it was rejected by the court, evidentally on two grounds, one of which was that the proffered testimony would invade the province of the jury.

On further voir dire examination by defense counsel it was established that the expert witness understood that billions of those type of pins had been manufactured and sold, but that he had no knowledge that there had ever been another accident or complaint concerning any injury from the use of the pins. As to the danger of flying fragments, we note that the witness, when asked by Sidwell's counsel, had no hesitation in breaking several of the pins in the presence of the jury and court officials.

At the conclusion of that portion of the testimony, counsel for the defense renewed his objection on the basis of lack of foundation, and on the basis that the witness was being asked to speculate. At that point the court ruled that the objection was sustained and when asked the basis therefore, stated: "On all the bases stated plus the ones I enumerated before."

On appeal it is argued that the court erred in sustaining the objection and rejecting the offer of proof on the basis that the expert witness's opinion would invade the province of the jury. If such were the only voiced objection, and it was sustained on that basis, we might agree. It is clear that the opinion testimony of an expert witness is not objectionable solely because it purports to invade the province of the jury in deciding ultimate facts. The Idaho Rules of Evidence, § 704, provides: "Opinion on ultimate issue. Testimony in the form of an opinion or inference *otherwise admissible* is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." *See* Comment to Rule 704 of the report of the Idaho State Bar Evidence Committee (December 16, 1983), wherein it is pointed out that the Idaho rule is identical to F.R.E. 704, and that Rule 704 is consistent with Idaho case law wherein are contained citations to the Idaho decisions.

In the instant case, however, objection was also made and sustained by the court on the basis that no foundation had been laid to indicate that the witness was qualified to render an opinion as sought by the question. The witness stated his qualifications in the field of metallurgy and was permitted to testify to matters such as the composition of the metal contained in the product, and the characteristics of such metal as being ductile or brittle. On the other hand, he had no knowledge or expertise in the area of the manufacture or usage of the product. He had no knowledge whether the product in question had been designed with brittleness as a desirable attribute. He had no expertise in the garment field. He did not know if other manufacturers produced similar products. During the offer of proof the witness was allowed to opine that since the pins were brittle and would break rather than bend, the fragment could fly off and injure some-

one. He also stated that although billions of the pins had been produced and sold, he had no knowledge of such an accident or injury. He also indicated that he had not determined whether the pin would break under normal use; agreed that hemming a skirt was normal use; and he did not feel the pins would break under such usage.

As stated in the Comment to I.R.Evid. § 702:

The diverse opinions in *Bean* [*Bean v. Diamond Alkali Co.*, 93 Idaho 32, 454 P.2d 69 (1969)] point out the need for a rule that permits flexibility in determining whether the expert is qualified and whether his testimony will be "helpful" to the trier of fact. There is no fixed rule by which a trial judge shall determine the exact degree of knowledge and skill an expert shall possess but his competency to testify must be determined by the court. [citations] Whether a witness is sufficiently qualified as an expert to state an opinion is a matter which is largely within the discretion of the trial court. [citations] The Idaho court has also held that the "admissibility of expert opinion testimony is discretionary with the trial court and will not be disturbed absent a showing of an abuse of discretion." [citations]

We hold that the qualifications of the witness to express the requested opinion were insubstantial and borderline at best, and the discretion of the trial court was not abused in its refusal to permit such opinion testimony.

The decisions and orders of the trial court are affirmed; costs to respondent; no attorney fees awarded.

DONALDSON, C.J., and McFADDEN and McQUADE, JJ. Pro Tem., concur.

BISTLINE, Justice, dissenting.

There is much in the majority opinion with which I readily agree. For instance, the case law holdings of this Court relative to directed verdicts are well stated. To those cases should also be added our more recent case of *Quick v. Crane*, 111 Idaho 759, 727 P.2d 1187 (1986). The majority writes:

On a motion for a directed verdict the moving party admits the truth of the adverse party's evidence and ever legitimate inference that may be drawn therefrom.... A directed verdict should only be granted when the evidence is so clear and undisputed that all reasonable minds must reach the same conclusion.... A motion for directed verdict presents a trial judge with a pure question of law, *i.e.*, whether, as a matter of law, plaintiff produced sufficient evidence (not a mere scintilla) from which reasonable minds could conclude that a verdict in favor of the plaintiff was proper. Upon appeal the standard of review is the same, *i.e.*, to determine whether as a matter of law plaintiff produced sufficient evidence from which reasonable minds could conclude that a verdict in favor of the plaintiff was proper....

... [A]lthough the court has power to grant a directed verdict at the close of plaintiff's case, the better and safer practice is to defer a ruling upon the motion until both sides have finally rested. It is also stated that even at the close of all the evidence it may be desirable to refrain from directing a verdict and submit the cause to the jury. Thereafter, on appellate review, if it is determined the trial court was in error in its appraisal of the evidence, judgment on the verdict can be entered without the need for an entire new trial. Majority opinion, p. 998 (citations omitted).

The majority opinion adequately acquaints the reader with the distinction between the German-manufactured Prym pins and the standard American-made "common" pins. Speaking of the Prym pins:

The metal used in the manufacturing process is of hardened tempered steel so it can be drawn to a thousandth of an inch. The pins are longer and thinner than common pins, are sold for use on fine materials, and hence the points are much sharper than a common pin so that

the fine materials will not be damaged. *Id.*, p. 997.

And the majority informs of the comparatively little use of the Pryms in this country: "Although popular in Europe, only approximately five percent of the dressmaking pins sold in the United States are of the Prym type of needle-steel pins." *Id.*, p. 998.[1]

The majority provides an account of how the injury to Michelle Sidwell was caused by a Prym pin:

> Plaintiff Sidwell was wearing a dress, and her mother was using pins to place a hem in the dress. When Sidwell bumped or brushed against a coffee table the impact drove a pin into her knee area with sufficient force to strike the end of her femur. The pin broke into three pieces, two of which remained in the knee. One of those fragments was surgically removed, but the other had lodged in the bone and since its removal would cause permanent impairment of the knee, it was not removed. There has been resultant pain and a serious curtailment of the activities of Sidwell. *Id.*, p. 997.

The majority stated fairly well the nature of Michelle Sidwell's claim against the defendants:

> [T]hat the pins were defective and unusually dangerous, that they were defectively designed, *and that there was a duty to warn of the brittle nature of the pins.* Sidwell asserted that the pins in question here differ from common ordinary pins used in dressmaking. She asserts that common ordinary pins are made from a material which is ductile, and hence the pins will bend when placed under stress. The pins at issue here, however, are made from a different type of material which is not ductile and hence are brittle, with a tendency to break rather than bend when placed under stress. *Id.*

Such would be a more acceptable statement of the claim if the word "asserted" were not used. The evidence established that the Prym pins *do* differ from common pins, and that common pins *are* ductile, and *will* bend, whereas the Prym pins *are* brittle and *do* break rather than bend. The pins *were* marketed in this country without any warning that they *are* brittle and *do* break rather than bend.

As the majority does note, we do:

> review the record to determine if Sidwell produced sufficient evidence upon which reasonable minds could find in favor of Sidwell. The evidence must be viewed in the light most favorable to Sidwell. In any event, the evidence is essentially uncontroverted. At this juncture there is no question but the accident happened and that Sidwell suffered some damage therefrom. Majority opinion, p. 998.

The majority, however, then proceeds into an analysis of the evidence which the directed verdict precluded the "reasonable minds" of twelve jurors from doing, as is *their* function.

Citing the *Rindlisbaker* case for the proposition that a failure to warn of a danger which a manufacturer had reason to anticipate may give rise to strict liability, but observing that this rule is limited to situations where the danger is not obvious, the majority correctly notes it to be "clear that the manufacturer could anticipate the danger of a pin pricking, puncturing, or piercing dressmaking or other materials or the bodily surface of a user." The majority opinion then states the obvious: All of those who use pins know that they can prick and/or puncture. Majority opinion, p. 999. So far, well and good. The majority then commendably points out the focus in Michelle Sidwell's case "is *not the danger of piercing or puncturing,* but rather the danger that a [Prym] pin will be driven into the body with such force that *it strikes a bone* and shatters because of its brittle nature." *Id.*

---

1. The majority does not inform us as to whether Prym is subject to strict liability abroad as it must be in this country and this state. If Prym is to market its pins in Idaho, then it must comply with the Idaho common law requirement to afford adequate warning.

Whether Michelle Sidwell should have been warned of the unknown shattering propensities of Prym pins was what the whole lawsuit was all about. But the majority, reasoning like some jurors might have done, or might not have done, then expostulates that Prym pins are no different than "a needle, a knife, or a pointed piece of lead in a pencil"—all of which, it is said: "if driven into [against] a solid object with sufficient force will break rather than bend." *Id.* Michelle's mother probably knew that about steel needles, but she was not using steel needles to outline and fit the line of hemming Michelle's dress, and for obvious reasons—it would have posed a danger. Likewise, she was not using a knife, nor a lead pencil. She was using pins of which neither she nor Michelle had any knowledge or warning were not bendable pins, but brittle pins which readily shatter.

Having meaninglessly discoursed on knives, needles and lead pencils, the majority pauses briefly to note other possible dangers which might result from unwarned use of Prym pins, none of which are involved or of concern in this case, and then returns to *Rindlisbaker*'s language that the "manufacturer must anticipate the product being used 'for the uses for which it is manufactured' or 'by its probable use,'" majority opinion, p. 999, and seemingly concedes that William Prym, Inc., "could anticipate that a user might attempt in dressmaking to bend such a pin or attempt to sew over the top of such pins, and in either event a fracture might result." *Id.* Then, the majority sets the stage for its holding which is dispositive against Michelle Sidwell's claim for the injury done here: "In the instant case, however, the manufacturer is asked to anticipate not only that pins will pierce, but they will be driven into the body with such force as to strike a bone and thus shatter."[2] *Id.*, p. 999. It is then stated by the majority:

The circumstances of this case have been described as a freak accident that probably could not be duplicated under any conditions. Defendant's knee and the dress material had to strike the coffee table at a precise point and angle, and with such force that the pin was driven into the knee area to a depth where it struck a bone. It is argued that such a series of events could never be experimentally duplicated.[3] *Id.*, p. 999.

Having set the stage, the majority writes out the verdict which it feels would have to be reached by twelve jurors:

We hold as a matter of law that reasonable minds could not differ on the inability of Prym to foresee the danger that the pins would be thrust into the body with sufficient force to strike a bone and shatter. We hold therefore that reasonable minds could not differ on the duty of Prym to warn of a danger which could not be foreseen. *Id.*, p. 999.

Begging to differ with the majority, I submit that on a jury of twelve men of reasonable minds, at least nine of them might very well wonder why the Prym Company did not warn American buyers that Prym pins were not your ordinary run-of-the-mill garden variety of common pins that do bend, and rather easily at that. With a jury of twelve women of reasonable minds, it would not be surprising if the jury verdict would be unanimous.

The "freak accident" argument might prove not in the least persuasive to a jury. A jury might easily see that in the process of marking or outlining a hem on a standing girl, there would be an opportunity for a pinhead to come in contact with a piece of furniture, and drive it into the leg. The main aspect of this incident was that the pin penetrated not the calf, not the thigh, but the knee. The only freak aspect of the case is that the pin not only shattered on impact with bone, but surgical technology

---

2. It would take no great force to drive a slim, steel pin through one-eighth inch of skin and strike into bone and/or cartilage.

3. The "freak accident" language was that of counsel for Prym at oral argument. Likewise, with the "could never be experimentally duplicated."

was unavailable to remove the one fragment.

Could reasonable minds differ? One would think so. For certain, able counsel for Michelle did not believe himself wasting his time and her money in pursuing the claim against Prym. As is true in many of such cases of product liability, it would have taken little effort and little money to warn the United States market that Prym pins are brittle and not your common American pin.

The jury had heard from three women who were experienced seamstresses, Michelle Dike, Sandra Dike, and Carol Stoddard, and a Mr. Galbreath who owned and operated a tailor's shop with six employees. Not one of these people, prior to Michelle Sidwell's accident, was aware that there was such a thing as a brittle straight pin such as the one here involved. There was nothing in the packaging, or otherwise, about the pins that would in any way indicate that they were brittle in nature.

The three women testified that if they had known that the pins were so brittle, they would never have allowed them in their home for fear of injury. Carol Stoddard and Sandra Dike, both, considered the sewing pins to be dangerous. Ralph Galbreath stated that there was no legitimate use for such brittle pins, that these pins would definitely break if used in leather or heavy materials, that he would never knowingly allow these breakable pins in his establishment, that the brittle pins would break in his normal use, and that, in his opinion, a reasonable, prudent tailor would not use such pins if he knew what they were.

Conceded that this was an accident, the jury very well might have found it to be foreseeable. That foreseeable accidents have to be taken into account was established as law in Idaho in the case of *Farmer v. International Harvester*, 97 Idaho 742, 751, 553 P.2d 1306, 1314 (1976): "The intended use of the truck includes within its scope, the reasonably foreseeable likelihood that in the normal course of operation a truck may be involved in a collision or

other accident...." This Court recently held that "[t]he factual question of foreseeability is for the jury to determine." *Sliman v. Aluminum Company of America*, 112 Idaho 277, 283, 731 P.2d 1267, 1273 (1986). The majority inexplicably ignores this controlling precedent, and that the trial judge improperly usurped the role of the jury.

The trial court at the least should have let the case go to the jury. In that manner it would have had the benefit of the reasonable minds of twelve ordinary people. Had the jury decided for the defendants, Michelle Sidwell could have had her day in court, as ordained by the Idaho Constitution, and undoubtedly would have thanked the judge and jurors for their consideration of her claim. If the jury decided for the plaintiff, the court still retained the power to set aside the verdict under Idaho procedure. As stated in this Court's most recent pronouncement:

"[T]he trial judge must view all of the evidence and all inferences drawn therefrom in favor of the non-moving party, and decide if there was substantial evidence to justify submitting the case to the jury, or, in other words, that there can be but one conclusion as to the verdict that reasonable minds could have reached. *Stephens [Stearns] supra*, 106 Idaho [249] at 253, 678 P.2d [41] at [45] [1984]; *Brand S Corp. v. King*, 102 Idaho 731, 733, 639 P.2d 429, [431] (1981)." *Quick v. Crane, supra*, 111 Idaho at 764, 727 P.2d at 1192.

A trial judge who is not influenced by the views of the jury will be an unusual jurist. Where the trial court, under the teaching of *Gmeiner v. Yacte*, 100 Idaho 1, 592 P.2d 57 (1979), has allowed the jury to render its decision, and that decision is in favor of the plaintiff, a motion for judgment n.o.v. still affords "the trial court [a] last opportunity to order the judgment that the law requires." *Quick v. Crane*, 111 Idaho at 764, 727 P.2d at 1192.