812 P.2d 1208

**STATE of Idaho, Plaintiff–Respondent,**

v.

**Daniel Edward RODGERS,
Defendant–Appellant.**

**No. 18993.**

Supreme Court of Idaho,
Boise, February 1991 Term.

June 7, 1991.

Rehearing Denied July 26, 1991.

Alan E. Trimming, Ada County Public Defender, Amil N. Myshin, Jr., Deputy Public Defender, argued, Boise, for defendant-appellant.

Larry EchoHawk, Atty. Gen., Lynn E. Thomas, Sol. Gen., argued, Boise, for plaintiff-respondent.

BAKES, Chief Justice.

Daniel Edward Rodgers was convicted of first degree murder in a jury trial on March 18, 1988, and was sentenced to a fixed life term without the possibility of parole. Rodgers appealed his conviction and sentence, and the case was assigned to the Court of Appeals. The Court of Appeals affirmed on all of the issues, 119 Idaho 1066, 812 P.2d 1227. Rodgers filed a petition for review of the decision of the Court of Appeals, which this Court granted. After review of the record in this case, we affirm.

The factual background of this case was succinctly reported by the Court of Appeals in its opinion as follows:

> Preston Murr attended a funeral in Boise on June 29, 1987. That afternoon, Murr and a small group of funeral participants became intoxicated and belligerent. A fight broke out between Murr and two others. Police were dispatched to the scene and Murr and the other two combatants were cited for disorderly conduct. Later that evening, Murr called the police from his sister's apartment where he was staying with his girlfriend. Murr told the police that someone had called and threatened to kill him.
>
> Murr made a telephone call to Rodgers, whom he knew, in an attempt to find out who had threatened him. He then left his girlfriend at the apartment and went to a Circle K store on Boise Avenue to meet Rodgers and Daron Cox. When Rodgers and Cox arrived at the store, Murr was observed using the pay telephone while holding a baseball bat. Murr joined Rodgers and Cox in Rodgers' car and drove to Murr's sister's apartment where the three discussed the

threatening telephone call and the whereabouts of guns that had been stolen from Rodgers. The three left the apartment and drove to Rodgers' house at 805 Linden Street where Rodgers obtained his gun. According to statements later made by Rodgers and Cox, Murr wanted to show Rodgers an apartment where he believed Rodgers' stolen guns were located. The trio then drove throughout Boise trying to locate the apartment and the persons who allegedly had stolen Rodgers' guns. Eventually Murr telephoned his girlfriend to inform her of his plans.

The trio then returned to 805 Linden Street. Around midnight, an altercation broke out and Murr was shot in the shoulder with a .357 magnum handgun. Murr ran out of the house and into the neighborhood in an attempt to escape. While trying to flee his attacker, Murr attempted to enter the home of a neighbor. The neighbor heard pounding at his door and someone screaming, "Let go of me." Then he heard an anguished yell. Peeking out the window, the neighbor saw someone chasing Murr. Murr was finally apprehended by his assailant and taken back into the house at 805 Linden Street. Thereafter, Murr was fatally shot in the back of the head with a .357 magnum bullet to the brain.

About this time, the neighbor telephoned the Boise Police Department Dispatcher to report the commotion outside and reported that there appeared to be blood on his door. The neighbor then looked out his window again and noticed two people at 805 Linden Street moving around the porch and yard. He then saw one of them hosing down the porch with a garden hose. Then one of the persons approached his house with a flashlight and appeared to be looking for something. The neighbor watched through the curtains, expecting the police to arrive. However, the police never responded to the call and he went to bed.

Murr's body had been cut into pieces with an axe and knives in the basement of Rodgers' home and placed into plastic bags. The bags were put into the trunk of a brown Grand Prix automobile belonging to Rodgers' wife. During the early morning hours of June 30, Rodgers and Cox drove the automobile to an area near Weiser, Idaho, on the Idaho–Oregon border. Most of the body parts were thrown into the Brownlee Reservoir. Part of the body that did not sink was taken to a bluff approximately 100 yards above the water. The plastic bags, bloody gloves and other clothing were discarded in a dumpster behind a convenience store in Meridian, Idaho.

The next morning, the neighbor observed a "brown sedan" stopped in the street next to his house, then it was driven away. He called the police and told them to come out and investigate the blood he found on his front screen door. The police arrived at the scene and upon seeing the trail of blood, called for backup. Blood was spattered on the neighbor's house as well as other houses in the neighborhood. The area was then blocked off as investigators arrived to determine whether someone was injured inside the house. After knocking and calling without answer, the police sealed off the area and waited for search warrants to be issued before entering the residence at 805 Linden Street. There, the officers found blood in the house, particularly in the basement. Drugs and money were also found and seized. They discovered a bullet fragment inside a clothes dryer and a bullet hole in a door at the top of the basement stairs. Eventually, they located a handgun belonging to Rodgers in the bottom of a speaker stand or cabinet.

Rodgers and his wife were arrested on June 30 and charged with possession of controlled substances with intent to deliver and other drug-related crimes. A few days later people discovered parts of Murr's body along the banks of the reservoir. Police charged Rodgers and Cox with murder. Cox talked to police, giving them details of the grisly murder, leading the police to evidence, placing blame on Rodgers for the murder, and

attributing his own involvement to his fear of Rodgers.

Separate trials were ordered for Rodgers and Cox. Rodgers' trial was scheduled first. He testified during his trial but Cox was considered unavailable and was not called to testify. Although Rodgers had made some exculpatory statements to police early in the investigation about where he had been on the night of the murder, he did not admit, until trial, that he was present at the 805 Linden Street residence when Murr was killed.

At trial, Rodgers related that he tried to break up a knife fight which occurred in the basement between Murr and Cox. He testified that Murr suddenly came at him with a knife and he fired a warning shot in self-defense. The shot unintentionally struck Murr in the shoulder as Murr rushed into Rodgers, knocking him down and causing him to lose his gun. As Murr then fled up the stairs, Cox seized the gun and fired at him. Cox chased him down and brought him back to the basement. Rodgers was then upstairs when he heard the fatal shot. Cox then came up, said that he had killed Murr, and announced his plan to dispose of the body. Rodgers testified that he could not participate in the butchery but admitted that he helped clean up and dispose of the evidence.

■ The jury convicted Rodgers of first degree murder, and the Court of Appeals affirmed. This Court granted appellant's petition for review primarily to consider the issue of the admissibility of expert testimony regarding the interpretation of blood spatter evidence. Rodgers claims that the trial court erred by allowing such testimony. Blood spatter analysis of evidence was discussed in *Farris v. State*, 670 P.2d 995, 997 (Ok.Crim.1983):

> The geometric Blood Stain Interpretation is a method used to reconstruct the scene of the crime. Blood stains are uniform in character and conform to the laws of inertia, centrifugal force and physics. Study of the blood pattern along with its size and shape helps determine the source of the blood and any movement that might have occurred after the

bloodshed began, including subsequent violent attacks upon the victim.

The State offered expert testimony on blood spatter interpretation to show, among other things, that Preston Murr was moving upstairs when he was first shot. This evidence directly contradicted Rodgers' trial testimony that he shot Murr in self defense as Murr was approaching him, moving away from the stairs.

On appeal, Rodgers argues that the testimony regarding blood spatter interpretation should not have been allowed because it has not been sufficiently accepted within the scientific community. Rodgers relies primarily on *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923) to assert that the trial court should not have allowed testimony on blood spatter interpretation. The traditional *Frye* test postulates that scientific evidence must be generally accepted within the scientific community before testimony on that particular practice will be admitted. 293 F. at 1014. Rodgers asserts that blood spatter interpretation has not generally been accepted within the scientific community and therefore, under the *Frye* test, the trial court erred by allowing the two witnesses to testify. However, in *State v. Crea*, 119 Idaho 352, 806 P.2d 445 (1991), we recently "decline[d] to adopt the *Frye* criterion as the basis for admission of scientifically derived evidence" with regard to the admissibility of testimony regarding the accuracy of an Intoximeter in a DUI case. Instead, in *Crea*, we emphasized that I.R.E. 702 provides the appropriate test for determining whether an adequate foundation had been laid to admit the testimony of the expert witness regarding scientifically derived evidence. I.R.E. 702 specifically states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

The committee commentary to I.R.E. 702 states that:

Because of the rules' emphasis on liberalizing expert testimony, doubt about whether an expert's testimony will be useful should generally be resolved in favor of admissibility unless there are strong factors such as time or surprise favoring exclusion.... Expert testimony may also be excluded when it would confuse the jury, be more prejudicial than probative, or be needlessly time-consuming.

*Report of the Idaho State Bar Evidence Committee,* C 702, p. 1 (1983).

Applying that standard, the trial court overruled Rodgers' objection that the evidence would have over-impressed or confused the jury, and admitted the expert testimony of the blood spatter interpretation.[1]

The other jurisdictions cited to us which have considered this issue have also held that blood spatter interpretation evidence is admissible. For example, in *Farris v. State,* 670 P.2d 995 (Ok.Crim.1983), a case similar to this case, the defendant also argued that blood spatter interpretation is not a recognized forensic science and that the expert witness was not sufficiently qualified to testify. In holding that blood spatter interpretation is a sufficiently recognized science, the Oklahoma Court of Criminal Appeals noted that it is recognized by the FBI, Scotland Yard, and the Oklahoma Bureau of Investigation.

In *State v. Hall,* 297 N.W.2d 80 (Iowa 1980), it was also argued that "bloodstain analysis was not a proper subject for opinion evidence because it is 'scientific' in nature and lacks the foundational requirement of general acceptance in the scientific community." 297 N.W.2d at 83. The Iowa Supreme Court admitted the evidence, holding:

Accordingly, we do not believe that "general scientific acceptance" is a prerequisite to admission of evidence, scientific or otherwise, if the reliability of the evidence is otherwise established.

Although the foundation evidence on reliability submitted here was not overwhelming, the trial court did not abuse its discretion in finding the bloodstain analysis sufficiently reliable to be admissible. Any weaknesses in the analysis could have been, and we presume they were, pointed out by cross-examination, with the ultimate weight of the evidence determined by the jury.

In the present case, the evidence offered to show the reliability of the blood stain analysis included: (1) Professor MacDonnell's considerable experience and his status as the leading expert in the field; (2) the existence of national training programs; (3) the existence of national and state organizations for experts in the field; (4) the offering of courses on the subject in several major schools; (5) use by police departments throughout the country in their day-to-day operations; (6) the holding of annual seminars; and (7) the existence of specialized publications.

297 N.W.2d at 85 (citations omitted). The court also stated that "[t]his evidence need not wait an assessment by the scientific community; the foundation evidence of reliability and the inherent understandability of the evidence itself provided sufficient bases for its admission." 297 N.W.2d at 86. *See also State v. Melson,* 638 S.W.2d 342 (Tn.1982); *State v. Hilton,* 431 A.2d 1296 (Me.1981); *Lewis v. State,* 737 S.W.2d 857 (Tx.App.1987) ("MacDonnell's studies are based on general principles of physics, chemistry, biology, and mathematics, and his methods use tools as widely recognized as the microscope; his techniques are neither untested nor unreliable. We hold that MacDonnell's testimony was properly admitted.").

---

1. The trial court implicitly recognized that this blood spatter evidence would help the jury "to understand the evidence or to determine a fact in issue ..." and properly admitted the testimony. For example, regarding Dan Christman's testimony, the trial court stated, "I think that I'll certainly let him testify to—if he can testify that he observed characteristics that are sufficient for him to reach a conclusion, I'd let him testify to directionality of particular blood spots. And I think I'd leave it up to the jury to decide whether that establishes a particular path.... That's the way I'm going to rule."

We find these cases persuasive. In this case, the testimony concerning blood spatter interpretation was not of a nature which would cause the jurors to be over-impressed by its aura of reliability. Blood spatter analysis is clearly a well-recognized discipline, based upon the laws of physics, which undoubtedly assisted the jurors in understanding what occurred the night Preston Murr was murdered. The testimony did not involve overly complex scientific or technological concepts with the potential for juror confusion.[2] Given the widespread acceptance of this evidence by other courts, and the fact that Rule 702 favors admissibility of expert testimony, we uphold the trial court's discretionary decision to admit blood spatter evidence.

■■■ Rodgers also contends on appeal that the two witnesses in this case, Dr. Irving Stone and Coroner Dan Christman, should not have been allowed to testify because they were not sufficiently qualified as experts in this area and thus did not meet the minimal foundational requirements. The district court and the Court of Appeals rejected these arguments, holding that the witnesses were sufficiently qualified as experts.

An expert witness has been defined by this Court "as someone possessing a certain skill or knowledge which is beyond the competence of the average layman or juror." *Potter v. Mulberry,* 100 Idaho 429, 599 P.2d 1000 (1979); *Stoddard v. Nelson,* 99 Idaho 293, 581 P.2d 339 (1978); *Bean v. Diamond Alkali Company,* 93 Idaho 32, 454 P.2d 69 (1969). Our cases hold that the trial court has discretion to determine whether a witness is sufficiently qualified to testify as an expert. *Sidwell v. William Prym, Inc.,* 112 Idaho 76, 730 P.2d 996 (1986); *Curtis v. DeAtley,* 104 Idaho 787, 663 P.2d 1089 (1983); *Sorensen v. Pickens,* 99 Idaho 564, 585 P.2d 1275 (1978). On this record we cannot say that the trial court abused its discretion in concluding that the two witnesses were qualified.

The Court of Appeals described each witness's qualifications as follows:

The first expert witness, Dr. Irving Stone, was a forensic scientist and chief of the physical evidence section at the Institute of forensic Sciences in Dallas, Texas. Stone supervised seventeen forensic scientists at the institute and was a special agent for the Federal Bureau of Investigation (FBI) spending two years in the FBI laboratory. Stone has also published a number of scientific articles regarding blood stain analysis. Stone had specific training in blood spatter pattern analysis, studied blood stain pattern literature, worked with other experts in the field, and has testified on blood spatter interpretation in the courts of Texas, Missouri, Arkansas, Illinois, Georgia and Puerto Rico.

The second expert was Ada County Deputy Coroner Daniel Christman. Christman had previously worked for the King County Medical Examiner's Office in Seattle, Washington, as a medical investigator and also as a pathology technician. Christman had an associate's degree in criminal justice from Bellevue Community College and had taken courses in geometric blood stain interpretation. He

---

2. In this case, no objection regarding jury confusion was made pursuant to I.R.E. 403, and thus the trial court did not engage in any balancing test. However, the Evidence Committee also pointed out that application of I.R.E. 403 safeguards against the possibility of jury confusion.

> The requirement of general scientific acceptance is in effect a requirement that the probative value of the evidence not be significantly outweighed by the risks of jury confusion, time wasting, or undue prejudice. Since the balancing is required under Rule 403, and since literal application of the general scientific acceptance test would preclude use of newly developed processes, even in contexts

> where they would pose no significant risks to the adjudicatory process, this rule requires only evidence of reliability for the foundation. Treating admissibility of scientific evidence as a relevancy problem accords with the modern view.
>
> In addition to weighing probative factors under Rule 403, the court should also assess the dangers posed by the particular kind of expert scientific evidence and evaluate the degree to which jurors might be over-impressed by the aura of reliability surrounding the evidence lest they abdicate their role of critical assessment.

*Report of the Idaho State Bar Evidence Committee,* C 702, p. 3 (1983) (citations omitted).

had also received specific instruction in the field of blood spatter interpretation by Sergeant Tom Bevel of the Oklahoma City Police Department. Sgt. Bevel was identified as an expert in the field by Stone. Christman has applied the principles of blood spatter pattern analysis in a number of cases and explained his methodology to the court and the jury. The district judge found the above qualifications sufficient to render Stone and Christman experts in the area of blood spatter pattern analysis. Based on the qualifications listed above, we hold the district court did not err by qualifying Stone and Christman as experts in blood spatter pattern analysis.

Dr. Stone also belongs to the International Association of Bloodstain Analysts and attended workshops conducted by Sgt. Tom Bevel of the Oklahoma state police department and Professor Herbert MacDonnell, two leading experts on blood spatter interpretation. Dan Christman had also attended training sessions and had consulted with Professor MacDonnell. Rodgers was given adequate opportunity to cross examine Dr. Stone and Christman both as to their qualifications and the nature of their testimony. Given these witnesses' extensive qualifications and experience, we conclude that the trial court did not err in finding that there was sufficient foundation for these witnesses' testimony and allowing them to testify. I.R.E. 702; *Sidwell v. William Prym, Inc.*, 112 Idaho 76, 730 P.2d 996 (1986); *Curtis v. DeAtley*, 104 Idaho 787, 663 P.2d 1089 (1983); *Sorensen v. Pickens*, 99 Idaho 564, 585 P.2d 1275 (1978).

Rodgers' petition for review raises several other issues, each of which was analyzed extensively in the opinion of the Court of Appeals. We concur in the analysis and disposition of those issues as set forth in the opinion of the Court of Appeals.

The judgment and sentence of the district court are affirmed.

JOHNSON, BOYLE and McDEVITT, JJ., concur.

BISTLINE, Justice, dissenting.

The reader is told by the majority opinion that the opinion of the Court of Appeals is reviewed by this Court "primarily to consider the issue of the admissibility of expert testimony regarding the interpretation of blood spatter evidence." 119 Idaho at 1049, 812 P.2d at 1210. This suggests that the treatment of this issue by the Court of Appeals is somehow deficient. In fact, the treatment by the Court of Appeals is just as good as that provided by a majority of this Court. The problem with both opinions is their unthinking rejection of *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923).

*Frye* is a simple two page opinion that affirms a trial court's decision not to admit evidence of the results of a lie detector test performed upon the defendant. The judges of that court, in the course of their short opinion, were convinced that they had to determine whether the lie detector involved a procedure sufficiently reliable to be admissible; not just in the case at bar but for cases to come:

> Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.

*Frye*, 293 F. at 1014.

The *Frye* opinion, written before the adoption of the Federal Rules of Evidence or the Idaho Rules of Evidence, nevertheless responds to a problem created by those compilations of rules. Using just the rules of evidence, it is too easy to establish the admissibility of novel scientific evidence: If the evidence is I.R.E. 401 relevant, it is admissible under I.R.E. 402 unless it does not satisfy I.R.E. 702's requirement that the evidence "will assist the trier of fact." The practically insignificant hurdle of I.R.E. 401 (legal relevance) is easily cleared

by the propounder of novel scientific evidence, and does not screen out scientific evidence that in time will prove to be untrustworthy. This problem, created by the rules of evidence, is remedied by the *Frye* requirement that novel scientific evidence gain general acceptance in the relevant scientific community before it may be used in any court.

Instead of actively embracing the *Frye* standard, this Court has treated *Frye* inconsistently. In *State v. Iwakiri*, 106 Idaho 618, 682 P.2d 571 (1984), this Court cited to *Frye* for the first time. *Iwakiri* discussed hypnotically refreshed (or confabulated) testimony, and pointed to three approaches to the admissibility of such testimony. All three, one of which was *Frye*, were rejected as "per se" rules of admissibility or inadmissibility, and a fourth approach was adopted to structure the inquiry surrounding the admissibility of hypnotic testimony. The approach adopted was termed the "totality of the circumstances" approach.

*Iwakiri* did not acknowledge that the *Frye* test comes into play, if at all, at a preliminary stage to determine whether the novel theory or scientific principle that produced the evidence is sufficiently reliable. This Court in *Iwakiri* passed this over by simply accepting, without discussion, that hypnosis assists memory, and went immediately to the question of preventing contamination of testimony by improper suggestions offered during hypnosis: "There needs to be some method of determining the admissibility of this type of testimony that will protect against the dangers of hypnosis, particularly the dangers of cueing and confabulation, and yet allow for receipt of the benefits of memory recall which hypnosis can produce." *Iwakiri*, 106 Idaho at 625, 682 P.2d at 578. In effect, *Iwakiri* accepts the reliability of hypnosis as a memory refresher, but does not engage in an analysis to determine that conclusion.

One would surmise on a quick reading of the opinion that *Iwakiri* put to rest all use of the *Frye* test to determine the admissibility of novel scientific evidence. However, in *Iwakiri* itself *Frye* is cited to with approval *after* the opinion rejected the application of the *Frye* test as a test for the admissibility of hypnotically induced testimony. *See* 106 Idaho at 626, 682 P.2d at 579 ("[a] witness should not be able to buttress his testimony by stating that his present recollection resulted from his or her hypnosis any more than a witness may buttress his direct testimony by testifying that he had made the same statements on a lie detector test and has passed the test. *Cf. Frye v. United States*, 293 F. 1013 (D.C.Cir.1923).").

The next use of *Frye* by this Court occurs in *State v. Crea*, 119 Idaho 352, 806 P.2d 445 (1991). In *Crea* the defendant challenged the results of an Intoximeter 3000 test from which the Taguchi cell had been removed. The majority declined "to adopt the *Frye* criterion as the basis for admission of scientifically derived evidence as relates to the issues presented in this appeal." That statement appears to restrict the rejection of *Frye* to the issue involved—the reliability of Intoximeter 3000's. However, in a footnote the attack on *Frye* was continued:

In [*Iwakiri*], we expressly rejected several per se evidentiary rules, one of which was the *Frye* rule, and adopted our own standard on the admissibility of certain scientific evidence. In *Iwakiri*, a case involving hypnotically induced testimony, *Frye v. United States* was cited as establishing a rule which "conditions the admissibility of evidence based on a new scientific method of proof on a showing that the technique has been generally accepted as reliable in the scientific community in which it developed." 106 Idaho at 623, 682 P.2d 571.

*Crea*, n. 2. The majority in *Crea* never affirmatively ruled whether the results of a breath test using an Intoximeter 3000 without the Taguchi cell is sufficiently reliable to always be admissible if relevant. Instead, and in spite of the apparent holding in *State v. Wilson*, 116 Idaho 771, 780 P.2d 93 (1989), that an Intoximeter 3000 with the Taguchi cell removed is not grounds for suppressing breath test results, *Crea* appears to leave it up to the individual trial

courts to determine whether a procedure is or is not reliable: "The admissibility of expert opinion testimony is discretionary with the trial court and will not be abused absent a showing of an abuse of discretion."

In contrast to *Crea* and *Iwakiri*, the majority's opinion in *State v. Garrett*, 119 Idaho 878, 811 P.2d 488 (1991), embraced the *Frye* opinion. *Garrett* ruled that the horizontal gaze nystagmus test was reliable, because it had been accepted by the relevant scientific community as trustworthy. This reason for identifying the gaze test as reliable is in essence the inquiry suggested by the *Frye* opinion. What was done implicitly in *Iwakiri* to determine the scientific reliability of hypnosis was done explicitly in *Garrett* to determine the reliability of the horizontal gaze nystagmus test.

What the Court of Appeals did in the present case is not inconsistent with a rejection of *Frye*. But, as we have seen, *Frye* has not been uniformly rejected by this Court. The Court of Appeals wrote in their *Rodgers* opinion that:

> Rodgers' next contention is that the practice of analyzing blood spatter patterns is not generally accepted in the scientific community. Rodgers cites *Frye v. United States*, 293 F. 1013 (D.C. Cir.1923), for the proposition that a foundation of general acceptance in the scientific community must be laid before expert testimony of a specific scientific technique may be admitted. However, "Rule 702 favors the admissibility of the testimony by experts if relevant and if it will assist the trier of fact to understand the evidence or resolve a controverted issue of fact, regardless of whether it is an ultimate issue of fact." G. BELL, HANDBOOK OF EVIDENCE OF THE IDAHO LAWYER at 242 (3d ed. 1987). The purpose of the *Frye* test is to ensure that the probative value of the expert testimony will not be significantly outweighed by the risk of jury confusion, time wasting or undue prejudice. *Id.* at 243. However, I.R.E. 403 ensures such balancing of the probative value versus its prejudicial effects and eliminates the

problem the *Frye* test created, namely, disallowing expert testimony utilizing new scientific and technological breakthroughs. Therefore, we hold the district court properly qualified [two witnesses for the State] as experts pursuant to Rule 702. Further, we hold the practice of analyzing blood spatter patterns is admissible in the Idaho courts when it is helpful for the trier of fact to determine the events that took place at the scene of the crime.

*Rodgers*, 119 Idaho at 1073, 812 P.2d at 1234–35. This excerpt from the Court of Appeals opinion faults the *Frye* test for keeping from the jury evidence worthy of consideration. In addition, the opinion declares that the study of blood spatter patterns has evolved sufficiently enough for courts to allow blood spatter experts to testify before a jury. This declaration places blood spatter analysis in the realm of I.R.E. 401 evidence, *i.e.* relevant evidence. In effect, the Court of Appeals opinion attacks *Frye* but at the same time answers the question *Frye* presents by holding that blood spatter evidence in this case and in the future is reliable and acceptable.

Today's majority opinion is somewhat better at discussing the reasons for putting faith in the reliability of blood spatter analysis, because it discusses how a few other states have treated this novel scientific evidence. However, both the Court of Appeals and this Court suffer from a desire to take short cuts through the rules of evidence, to which they are bound to follow. In particular, both opinions leave out an explicit consideration and discussion of I.R.E. 401, an important step in the determination of probative value. Instead, the opinions cut to the I.R.E. 702 determination of whether this purportedly "scientific" evidence will assist the trier of fact. Such an analysis assumes that it is indeed reliable scientific evidence that is being offered.

In more focus, the concern of this dissent is that this Court has more often than not rejected *Frye* without replacing it with a considered analysis. If *Frye* is rejected, it must be replaced with something. Other-

wise, every form of "scientific" evidence, even evidence that does not deserve that label, will be admissible for the jury's consideration. Such prejudice in a criminal trial is improper.

The prejudice of labelling something for the jury's consideration as scientific, when it may not be, appears to exist here. This conclusion is reached by applying common sense to the "experiments" conducted by blood spatter "experts" in their attempts to replicate what happens when a crime victim has been injured. As one of the experts for the prosecution testified, blood spatter experiments are conducted using old blood received from blood banks. The blood is put into plastic bags and containers and dropped to the ground, or plastic bags filled with blood are strapped to one of the "scientists" before they run into an object, such as a wall. Tr. Vol. 13, 1411–413. Obviously, this sort of experimentation does not take into account factors such as the thickness of a victim's skin at the injury site, or the presence of a large blood vessel, bone or hair that may impede or accelerate the loss of blood by the victim. These are the considerations that common sense dictates should be taken into account by any blood spatter expert.

If one reviews an article on blood spatter, it becomes quite clear that this is a new science in need of further research before it may be properly relied upon in a court of law. For example, as recently as 1983 an article on the subject concluded that "[b]ackwards spatter of blood from gunshot wounds is a complex phenomenon which we do not pretend to understand completely." In addition, the introductory paragraph warned that:

> The distribution of blood projected from a gunshot wound can be valuable information in understanding and reconstructing a gunshot wound or death scene. Most forensic science experts have observed blood and material that is spattered in a backwards direction from gunshot wounds, but the phenomenon is not well described in the literature and is not generally referred to in standard texts. As a result there have been considerable differences in expert interpre-

tation of crime scenes and court testimony. Some experts have even testified that back spatter of blood from gunshot wounds does not exist.

Stephens and Allen, *Back Spatter of Blood from Gunshot Wounds—Observations and Experimental Simulation,* J. of Forensic Sci. 437–39 (Apr.1983). The authors, both medical doctors, performed their research by firing bullets into blood soaked sponges.

The danger presented by expert testimony interpreting blood spatter evidence is that the prosecution is provided with an expert who *appears* to be able to reconstruct precisely what happened by looking at the blood left at the scene of a crime. However, a quick review of the "science" relied upon by the expert suggests that we would be better off proving guilt beyond a reasonable doubt without the help of such experts.

For the reasons above set forth I am unable to concur in the Court's opinion.