932 P.2d 348

**Daniel E. RODGERS, Petitioner–
Appellant,**

v.

**STATE of Idaho, Respondent.**

**Docket No. 22417.**

Supreme Court of Idaho,
October 1996, North Idaho Term.

Jan. 23, 1997.

Manweiler, Bevis & Cameron, Boise, for appellant.

Alan G. Lance, Attorney General; John C. McKinney, Deputy Attorney General, Boise, for respondent.

SCHROEDER, Justice.

Daniel Rodgers appeals the district court's order denying a petition for post-conviction relief following a judgment of conviction and sentence of life imprisonment for the first degree murder of Preston Murr. Rodgers sought post-conviction relief upon the grounds of: (1) newly discovered evidence, (2) ineffective assistance of trial counsel, (3) ineffective assistance of appellate counsel, (4) prosecutorial misconduct, and (5) attorney-client conflict between Rodgers and his trial counsel.

## I.

## BACKGROUND AND PRIOR PROCEEDINGS

The factual background of this case has been reported by the Court of Appeals, *State v. Rodgers*, 119 Idaho 1066, 812 P.2d 1227 (Ct.App.1990) (*Rodgers I*), and was adopted by this Court in *State v. Rodgers*, 119 Idaho 1047, 812 P.2d 1208 (1991) (*Rodgers II*), as follows:

Preston Murr attended a funeral in Boise on June 29, 1987. That afternoon, Murr and a small group of funeral participants became intoxicated and belligerent. A fight broke out between Murr and two others. Police were dispatched to the scene and Murr and the other two combatants were cited for disorderly conduct. Later that evening, Murr called the police from his sister's apartment where he was staying with his girlfriend. Murr told the police that someone had called and threatened to kill him.

Murr made a telephone call to Rodgers, whom he knew, in an attempt to find out who had threatened him. He then left his girlfriend at the apartment and went to a Circle K store on Boise Avenue to meet Rodgers and Daron Cox. When Rodgers and Cox arrived at the store, Murr was observed using the pay telephone while holding a baseball bat. Murr joined Rodgers and Cox in Rodgers' car and drove to Murr's sister's apartment where the three discussed the threatening telephone call and the whereabouts of guns that had been stolen from Rodgers. The three left the apartment and drove to Rodgers' house at 805 Linden Street where Rodgers obtained his gun. According to statements later made by Rodgers and Cox, Murr wanted to show Rodgers an apartment where he believed Rodgers' stolen guns were located. The trio then drove throughout Boise trying to locate the apartment and the persons who allegedly had stolen Rodgers' guns. Eventually Murr telephoned his girlfriend to inform her of his plans.

The trio then returned to 805 Linden Street. Around midnight, an altercation broke out and Murr was shot in the shoulder with a .357 magnum handgun. Murr ran out of the house and into the neighborhood in an attempt to escape. While trying to flee his attacker, Murr attempted to enter the home of a neighbor. The neighbor heard pounding at his door and someone screaming, "Let go of me." Then he heard an anguished yell. Peeking out the window, the neighbor saw someone chasing Murr. Murr was finally apprehended by his assailant and taken back into the house at 805 Linden Street. Thereafter, Murr was fatally shot in the back of the head with a .357 magnum bullet to the brain.

About this time, the neighbor telephoned the Boise Police Department Dispatcher to report the commotion outside and reported that there appeared to be blood on his door. The neighbor then looked out his window again and noticed two people at 805 Linden Street moving around the porch and yard. He then saw one of them hosing down the porch with a garden hose. Then one of the persons approached his house with a flashlight and appeared to be looking for something. The neighbor

watched through the curtains, expecting the police to arrive. However, the police never responded to the call and he went to bed.

Murr's body had been cut into pieces with an axe and knives in the basement of Rodgers' home and placed into plastic bags. The bags were put into the trunk of a brown Grand Prix automobile belonging to Rodgers' wife. During the early morning hours of June 30, Rodgers and Cox drove the automobile to an area near Weiser, Idaho, on the Idaho–Oregon border. Most of the body parts were thrown into the Brownlee Reservoir. Part of the body that did not sink was taken to a bluff approximately 100 yards above the water. The plastic bags, bloody gloves and other clothing were discarded in a dumpster behind a convenience store in Meridian, Idaho.

The next morning, the neighbor observed a "brown sedan" stopped in the street next to his house, then it was driven away. He called the police and told them to come out and investigate the blood he found on his front screen door. The police arrived at the scene and upon seeing the trail of blood, called for backup. Blood was spattered on the neighbor's house as well as other houses in the neighborhood. The area was then blocked off as investigators arrived to determine whether someone was injured inside the house. After knocking and calling without answer, the police sealed off the area and waited for search warrants to be issued before entering the residence at 805 Linden Street. There, the officers found blood in the house, particularly in the basement. Drugs and money were also found and seized. They discovered a bullet fragment inside a clothes dryer and a bullet hole in a door at the top of the basement stairs. Eventually, they located a handgun belonging to Rodgers in the bottom of a speaker stand or cabinet.

Rodgers and his wife were arrested on June 30 and charged with possession of controlled substances with intent to deliver and other drug related crimes. A few days later people discovered parts of Murr's body along the banks of the reser-

voir. Police charged Rodgers and Cox with murder. Cox talked to police, giving them details of the grisly murder, leading the police to evidence, placing blame on Rodgers for the murder, and attributing his own involvement to his fear of Rodgers.

Separate trials were ordered for Rodgers and Cox. Rodgers' trial was scheduled first. He testified during his trial but Cox was considered unavailable and was not called to testify. Although Rodgers had made some exculpatory statements to police early in the investigation about where he had been on the night of the murder, he did not admit, until trial, that he was present at the 805 Linden Street residence when Murr was killed.

At trial, Rodgers related that he tried to break up a knife fight which occurred in the basement between Murr and Cox. He testified that Murr suddenly came at him with a knife and he fired a warning shot in self-defense. The shot unintentionally struck Murr in the shoulder as Murr rushed into Rodgers, knocking him down and causing him to lose his gun. As Murr then fled up the stairs, Cox seized the gun and fired at him. Cox chased him down and brought him back to the basement. Rodgers was then upstairs when he heard the fatal shot. Cox then came up, said that he had killed Murr, and announced his plan to dispose of the body. Rodgers testified that he could not participate in the butchery but admitted that he helped clean up and dispose of the evidence.

*Rodgers II*, 119 Idaho at 1047–49, 812 P.2d at 1208–10.

The jury convicted Rodgers of first degree murder, and the district court imposed a fixed life sentence. The Court of Appeals affirmed Rodgers' conviction and sentence of life imprisonment. *Rodgers I*, 119 Idaho at 1078, 812 P.2d at 1238. This Court reviewed the Court of Appeals' decision and affirmed the conviction and sentence. *Rodgers II*, 119 Idaho 1047, 812 P.2d 1208 (1991).

Rodgers petitioned the district court for post-conviction relief. He appeals the district court's finding that he failed to prove

any claim that would entitle him to post-conviction relief.

## II.

### THE TESTIMONY OF TIM HOWELL WAS NOT "NEWLY DISCOVERED" EVIDENCE ENTITLING RODGERS TO A NEW TRIAL.

■ At the hearing for post-conviction relief Rodgers offered the testimony of his former brother-in-law, Tim Howell, to establish that the search of the home where the killing took place was illegal and that the evidence obtained in that search should not have been admitted at trial. Rodgers asserts that Howell's testimony established that the police conducted the search of the home in the morning. The search warrant for the house was not issued until the afternoon of that day. Rodgers testified that he did not learn of the evidence regarding the knowledge of his former brother-in-law until after he was convicted, sentenced and serving time at the Idaho State Correctional Institution, and that the failure to discover this evidence was not due to a lack of diligence.

The district court made the following findings:

It is uncontradicted that the police obtained a warrant around 2:00 p.m. on June 30, 1987. At the suppression hearing, a witness testified that she called Rodgers' house on the morning of June 30th, and the telephone was answered by a person named Lance. "Lance" was Lance Anderson, a Boise police detective. Anderson testified, however, that the call was received at 4:30 p.m., after a judge had issued the warrant.

9. The "newly-discovered" evidence consists of testimony of Rodgers' former brother-in-law that he drove by Rodgers' house on June 30th. Access was blocked by police ribbon. He saw police walking around and he saw police carrying two green garbage bags with something in them. He did not actually see any police enter or leave the house. While he thought he made his observations in the morning, he admitted that it was possible that he made the observations in the after-

noon. It was not "until years later" that he told anyone of his observations.

As the district court pointed out, Howell did not actually see any officers inside the residence prior to the search warrant's arrival, and he admitted under cross-examination that it was possible that he drove by the residence and made his observations at 3:15 or 3:30 in the afternoon, rather than in the morning.

The district court accepted the testimony of Lance Anderson who reaffirmed his suppression hearing testimony that no law enforcement officers entered the residence until after a search warrant was obtained.

Rodgers maintains that Howell's testimony is newly discovered evidence entitling him to a new trial pursuant to the Uniform Post-Conviction Procedure Act because he claims:

there exists evidence of material facts, not previously presented and heard, that requires vacation of the conviction or sentence in the interest of justice.

I.C. § 19–4901(a)(4).

■ The request for a new trial in a post-conviction proceeding based on newly discovered evidence is the same as a motion for new trial subsequent to a jury verdict. The test for determining whether Howell's testimony entitled Rodgers to relief was set forth in *State v. Drapeau*, 97 Idaho 685, 551 P.2d 972 (1976):

A motion [for a new trial] based on newly discovered evidence must disclose (1) that the evidence is newly discovered and was unknown to the defendant at the time of trial; (2) that the evidence is material, not merely cumulative or impeaching; (3) that it will probably produce an acquittal; and (4) that failure to learn of the evidence was due to no lack of diligence on the part of the defendant.

97 Idaho at 691, 551 P.2d at 978; *Cunningham v. State*, 117 Idaho 428, 433, 788 P.2d 243, 248 (Ct.App.1990).

Rodgers does not meet the second and third requirements of the *Drapeau* test for a new trial. The second element is that the evidence be material, not merely cumulative or impeaching. Howell stated with regard to

the time of the search that it "seems to me it was in the morning." On cross-examination he admitted that it was possible that he drove by the house at 3:15 or 3:30 in the afternoon. The district court found it significant that Howell did not make his observations known "until years later." For these reasons the testimony would only have impeachment value and was cumulative of evidence submitted at the suppression hearing held in 1987.

The third requirement of *Drapeau* mandates that "newly discovered" evidence be likely to produce an acquittal. Howell's testimony is not so strong and of such a nature that would likely result in an acquittal. Again, the testimony is tentative. It did not persuade the district court that the search was conducted illegally.

The conclusions of the district court are supported by substantial, competent evidence and Rodgers has not met the requirements of *Drapeau* for a new trial.

## III.

### RODGERS HAS NOT SHOWN INEFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL.

The standard for evaluating a claim of ineffective assistance of counsel was set forth by the United States Supreme Court in *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), and in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Idaho has explicitly adopted this standard. *Giles v. State*, 125 Idaho 921, 924, 877 P.2d 365, 368 (1994), *cert. denied*, 513 U.S. 1130, 115 S.Ct. 942, 130 L.Ed.2d 886 (1995). "[C]ounsel's performance must have been so incompetent that the trial can not be relied upon as having produced a just result. It is for the accused to show that counsel made serious errors and that the errors resulted in actual prejudice." *Giles*, 125 Idaho at 924, 877 P.2d at 368 (citing *Strickland*, 466 U.S. at 686, 104 S.Ct. at 2063–64). The two tests which must be met in order to be entitled to relief are: (1) a showing that counsel's performance fell below an objective standard of reasonableness, and (2) a showing that, but for counsel's

errors, the result of the proceedings would have been different. *McCoy v. State*, 129 Idaho 70, 76, 921 P.2d 1194, 1200 (1996).

■ Rodgers asserts that he wanted to call co-defendant Daron Cox as a witness at trial, but defense counsel mistakenly believed that Cox could claim the Fifth Amendment privilege if called to testify. Rodgers argues that Cox could have been called to testify without exposing counsel to any ethical violation; however, counsel proceeded under the mistaken belief that Cox was an "unavailable" witness. Rodgers maintains that he received ineffective assistance of counsel by his trial counsel's failure to call Cox to the stand to testify.

■ Counsel's choice of witnesses falls within the area of tactical, or strategic decisions, as does counsel's presentation of evidence. *Giles*, 125 Idaho at 924, 877 P.2d at 368. The district court found that defense counsel did not want Cox to testify because his testimony would have been devastating to Rodgers. At the evidentiary hearing on the ineffective assistance of counsel claim, one of the trial counsel for Rodgers stated that "Cox made a lot of very damaging statements about Dan [Rodgers]. I certainly didn't want him to testify to saying those things." The logic of that trial strategy is evident. Trial counsel had a rational strategy in not calling Cox as a witness, and this tactical decision will not be second-guessed on review.

■ In *Giles* this Court was not persuaded that counsel had made "serious errors" which prejudiced the outcome of the underlying criminal case. 125 Idaho at 924, 877 P.2d at 369. "Unless prejudice is presumed, the accused bears the burden of demonstrating prejudice to the outcome." *Id.* Rodgers has not demonstrated actual prejudice to the outcome of his criminal case resulting from counsel not calling Cox to testify at trial. The district court found, and trial counsel indicated, that testimony from Cox would be more beneficial for the prosecution than the defense. The district court's determination is supported by evidence and logic.

## IV.

### RODGERS WAS NOT DENIED EFFECTIVE ASSISTANCE OF COUNSEL DURING THE APPEAL PROCESS.

Rodgers argues that appellate counsel failed to raise the issue of sufficiency of the evidence regarding the jury's verdict on appeal.

The district court made the following findings:

A review of the evidence presented at trial shows that there was not simply "substantial competent evidence" to support the verdict—the evidence overwhelmingly supported the verdict and pointed to Rodgers' guilt. It would have been an exercise in futility to have moved to dismiss the state's case for lack of evidence or to urge insufficiency of the evidence as a ground for appeal.

The district court found there was overwhelming evidence of guilt submitted to the jury. A review of the trial record supports that determination. Rodgers' claim of ineffective assistance of appellant counsel fails the test because a challenge to the sufficiency of the evidence on appeal would have been futile.

## V.

### RODGERS HAS NOT SHOWN PROSECUTORIAL MISCONDUCT THAT WOULD HAVE INFLUENCED THE OUTCOME OF THE TRIAL.

■ Rodgers claims that the prosecution misrepresented the right of Daron Cox to invoke the Fifth Amendment privilege against self-incrimination and improperly represented that Cox would refuse to testify at trial.

The following dialog between the prosecutor and defense counsel is the basis for Rodgers' claim of prosecutorial misconduct:

Mr. Bower: Under what circumstances were you going to call Cox?

Mr. Adams: If I want to examine him in front of the jury.

Mr. Bower: He would have the right to take the Fifth Amendment.

Mr. Adams: He would if you called him, too, Greg.

Mr. Bower: That's what I mean. I don't think ethically you can call him in front of the jury and ask him to testify. That would be a violation.

Mr. Adams: Well, you know how to file one. I'm telling you if I decide to call him, it's going to stretch it out a while. We should have that determination by the morning, or perhaps we could have it by 5 today.

■ The scope of post-conviction relief is limited. An application for post-conviction relief is not a substitute for an appeal. I.C. § 19–4901(b). "[A] claim or issue which was or could have been raised on appeal may not be considered in post-conviction proceedings." *Whitehawk v. State,* 116 Idaho 831, 832–33, 780 P.2d 153, 154–55 (Ct.App.1989) (citing I.C. § 19–4901(b)).

Rodgers' claim of prosecutorial misconduct based on statements concerning Cox's ability to assert the Fifth Amendment privilege could have been raised during the earlier litigation that also challenged the prosecutor's conduct. 119 Idaho at 1074, 812 P.2d at 1235. Since this issue could have been raised on appeal, it is not properly before this Court in an appeal of a post-conviction proceeding.

The district court concluded that the "prosecutorial misconduct issue was resolved in *Rodgers I,* and Rodgers has presented nothing new. In any event there was no misconduct that would have merited a new trial." The record supports the district court's conclusion.

## VI.

### RODGERS HAS NOT ESTABLISHED A CLAIM OF INEFFECTIVE ASSISTANCE OF COUNSEL BASED ON A CONFLICT OF INTEREST.

■ The district court made the following findings regarding Rodgers' claim of ineffective assistance of counsel based on a conflict of interest:

On the conflict question, there is no evidence that Mr. Myshin, Mr. Adams, or the

Ada County public defender's office had an actual conflict of interest that prevented them from handling Rodgers' case. Rodgers claims of a conflict arose at the sentencing phase, but the problem was not a conflicting interest that would have prevented proper representation. Rather, it was a conflict about tactical decisions made during trial.... Rodgers indicated to the court that he wanted to fire his attorneys. The court scheduled a hearing, but before the hearing was completed Rodgers consulted Myshin and Adams, who advised them that he would be foolish to change attorneys at that stage because of their special familiarity with the evidence and with the course of the proceedings.... Rodgers received sound advice to continue with the same attorneys, and there was no conflict of interest.

A determination of whether counsel's representation of a client is in conflict is a mixed question of law and fact. *Cuyler v. Sullivan,* 446 U.S. 335, 342, 100 S.Ct. 1708, 1714–15, 64 L.Ed.2d 333 (1980).

Rodgers is not explicit about the nature of the alleged conflict of interest. As the appellant in this matter, he bears the burden on appeal. He has not met that burden. The district court's determination is supported by the record.

## VII.

## CONCLUSION

The district court's order denying the petition for post-conviction relief is affirmed. No costs are awarded on appeal.

McDEVITT, C.J., and JOHNSON, TROUT and SILAK, JJ., concur.